UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6168-CR-FERGUSON

UNITED STATES OF AMERICA          )
                                  )
v.                                )
                                  )
BRUCE HOLLANDER                   )
_____

NIGHT BOX
FILED

OCT 15 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / FTL

### GOVERNMENT'S MOTION
### IN LIMINE

The United States of America, by and through its undersigned counsel, hereby files this Motion in Limine to exclude testimony and other evidence, which the government anticipates the defendant will present at the trial of this case. The evidence, which includes information regarding foreclosures on properties that took place long after the false statements were made by the defendant, evidence as to how the fraudulent transactions could have been legally structured, and recorded evidence wherein the defendant states his opinions as to what a jury will do if presented this case. This evidence is clearly irrelevant, and highly prejudicial. The government requests that the evidence be excluded.

1.    The defendant is charged in a thirteen count superseding indictment with one count of  conspiracy to commit mail fraud, wire fraud, and making false statements in order to obtain loans that were insured by HUD, five (5) counts of wire fraud, six (6) counts of making false statements in order to obtain loans that were

1

insured by HUD, and one count of money laundering conspiracy.

2.    The government intends to prove that the defendant, who is a lawyer and was the owner of a title company, was the closing agent and provided the title work for approximately 40 of the closings on "flip" transactions for coconspirators Cohen and Silverman.   As the title agent, a few days prior to closing, the defendant would execute a title commitment policy, also called a fund commitment form, which the defendant would sign stating who owns the property and what steps need to be taken to clear title. For each of the closings for Cohen and Silverman the defendant would direct his employees to falsely prepare the title commitment form stating that Silverman's company, American Redevelopment Corporation (ARC), owned the property, instead of the actual seller.  The title commitment would also fail to list an effective date and fail to list on its Schedule B that one of the steps that needed to be taken to clear title was that a deed needed to be issued from the actual seller to ARC.  The defendant would sign these erroneous title commitment forms and they would be faxed to the mortgage broker who would then fax the erroneous title commitment to the ultimate lender. Witnesses will testify that the defendant knowingly executed these false title commitments, because otherwise the lenders would not make the loans.   These title commitments were a requirement before the loan could be closed. After receiving these title commitments the lender would send their

2

closing instructions.  The government will also prove that the defendant knowingly executed or caused to be executed false HUD-1's and addendums to the HUD-1's, which included certain "gift" payments that were not made by relatives of the buyers.

3.    The government believes that the defendant intends to attempt to defend these charges by introducing irrelevant evidence, including the following:

A.    Testimony that the foreclosure rate on the 40 loans was not any greater than on other loans made by HUD;

B.    Testimony that the defendant and his coconspirators could have legally complied with the HUD requirements regarding "gift" funds, if they would have given the "gift" payments to a charitable organization;

C.    Testimony that the lenders were not defrauded, because an appraiser appraised the 40 properties for the "flipped" price of the property; and

D.    Playing the portion of a tape recording between the defendant and coconspirator Eric Silverman that includes the defendant's opinions as to what a jury would do if given the evidence regarding the number of foreclosures on the forty (40) properties and evidence regarding how they could have legally complied with HUD's "gift" requirements as further explained in paragraph 7, below.

4.    The above-listed evidence that the defendant intends to

3

introduce is not relevant to any of the elements of the charged offenses, and is clearly intended merely to elicit sympathy for the defendant. This is best illustrated by the defendant's attempts to introduce the foreclosure rates of the properties, and evidence that buyers are making payments on some of the properties. The case law is clear that financial loss to the government or to the mortgagors is not an element of any of the charged offenses, and has no bearing on the case. See e.g. <u>United States v. Farrington</u>, 389 F. 2d 357 (6th Cir. 1968)(financial loss has no bearing on Section 1010 offense); <u>US v. Bailey</u>, 123 F.3d 1381 (11th Cir. 1997)(a conviction for mail fraud requires only that the fraudulent scheme existed, not that the scheme succeeded);  <u>US v. Lea</u>, 618 F.2d 426, 429 n.3 (7th Cir 1980)(Proof of pecuniary loss is not essential to a mail fraud conviction); <u>US v. Patterson</u>, 528 F.2d 1037 (5th Cir. 1976); <u>US v. Gross</u>, 416 F.2d 1205, 1209 - 10 (8th Cir. 1969)(Section 1343 does not require that the scheme be successful, or that the victim suffer a loss). Similarly, in <u>United States v. Haddock</u>, 956 F. 2d 1534 (10th Cir. 1992) the Tenth circuit upheld a bank fraud conviction for a defendant who misapplied the proceeds of a bank loan, even though he repaid the loan to the bank. As financial loss is not an element of any of the offenses charged, evidence of the foreclosure rate on these properties and whether certain of the buyers continue to make payments has absolutely no bearing on this case, and must be excluded as irrelevant.

4

5.     The defendant also intends to introduce evidence that the defendant and his coconspirators could have legally complied with the HUD requirements regarding gift funds if they would have given the "gift" payments to a charitable organization.   This testimony   is   mere   speculation.     The   defendant   and   his coconspirators knew that Silverman was illegally paying the "gift" funds for the buyers.  The fact that after the conspiracy had ended the defendant became aware that he and his coconspirators may have been   able   to   legally   make   "gift"   payments   through   charitable organizations is absolutely irrelevant.  This testimony is simply an attempt to play to the sympathy of the jury, which is improper. As  the  testimony  would  have  no  bearing  on  any  element  of  the offense,   any   testimony   regarding   how   the   defendant   may   have complied  with  the  HUD  requirements  for  "gift"  funds  would  be irrelevant.

6.     The defendant also intends to elicit testimony that the properties were fairly appraised at the higher "flipped" price.  As noted  above,  the  defendant  provided  false  title  commitments  to lenders, which intentionally hid the fact that Silverman's company, American  Redevelopment  Corporation,  was  purchasing  the  property first before reselling the property on the same day to the ultimate buyer for approximately $15,000 more.   The defendant intends to show  that  the  lender  was  not  harmed,  because  the  property  was always appraised for the higher price.   Once again, the fact that

5

the lender was or was not harmed is irrelevant.  Actual harm is not
an element of any of the charged offenses.

    7.    In October 1999, the  government sent coconspirator Eric
Silverman to meet with the defendant and discuss the pending
investigation.  During the course of the conversation on a number
of occasions the defendant offered his opinion as to what a jury
would do with this case.  As an example the following is set forth
on pages 17 and 18 of the attached excerpts of the transcripts:

> ...I don't know that that's a great case,
> that the State Attorney's Office wants to
> bring, to spend all the money it takes,
> involved in a trial, understand that,
> by way of defense, here comes 100 people,
> who all bought houses, who are living in the
> houses, who are making their mortgage payments...

    On pages 21 and 22 of the attached excerpts the defendant
discusses with Silverman the HUD gift rules and states that if you
look at the big picture, the buyers are making the payment(s).  On
pages 28 and 30 there are similar conversations wherein the
defendant alludes to the defense that the buyers are making the
payments.  On pages 30 through 34 Hollander's conversation with
Silverman was interrupted by an unrelated telephone conversation.
On page 34 through page 35 the defendant continues and gives his
opinion as to what a jury would do if they knew that statutes were

passed and it was now okay to give the "gift" funds.[1]

    8.    The government requests that the tape recording wherein the attached excerpts of conversations take place should be redacted to exclude the defendant's opinions as to what a jury will do.  The defendant's opinions are especially improper as they are based on inadmissible evidence regarding the purported law change to the "gift" rules; and the buyers continuing to make payments.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By:_____

JEFFREY N. KAPLAN
Assistant United States Attorney
FLA BAR No.  A005500030
500 E. Broward Blvd., Suite 700
Fort Lauderdale, Florida 33394
Tel: (954) 356-7255x3515
Fax: (954) 356-7336

---

[1]The government does not believe that what the defendants did is now legal, but that issue is not relevant.  The defendant's opinion as to what the jury would do with that information is irrelevant.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered by United States mail, this _____ day of _____, 2001, to: Joel Hirschhorn, Esq., Douglas Center, Penthouse One, 2600 douglas Road, Coral Gables, Florida 33134.

JEFFREY N. KAPLAN
Assistant United States Attorney

8

ES:    Um hum.

BH:    Okay. And, as far as I know, American Redevelopment did was okay. Everything you did was okay. I can't answer what happened with the mortgage application and the documentation for the mortgages, because I wasn't there. It was respect to a couple of the "gift" dollars and stuff like that. If you, asked Libby to cut you a back a check for a certain amount of money, and she accommodated you, you know, because you're the president of American Redevelopment, instead of making a check to American Redevelopment, and American Redevelopment giving you some money, you asked her to cut you some money, and coincidentally that money matches the amount of the UI, I would be, it would be preference preferential that it, preferred that it was UI

ES:    UI

BH:    Okay. But I think there's some cases where you actually got some money out of the closing that didn't match the "gift" letter that weren't the same amount.

ES:    Um hum.

BH:    Okay. For whatever reason. So, you know, again, I don't know that that's a great case, that the State Attorney's Office . . .

ES:    It would be . . . It wouldn't be the State, it would be the U.S. Attorney.

SC:    UI

BH:    UI

ES:    No.

BH:    . . . wants to bring, to spend all the money it takes, involved in a trial, understand that, by way of defense, here comes 100 people, who all bought houses, who are living in the houses, who are making their mortgage payments . . .

ES:    Um hum.

BH:    that are so thankful for, the, the things that you did, that maybe, in the final analysis, there were some technical violations, that occurred . . .

ES:    Um hum.

BH:    you know, that you guys did or whatever, I don't know, if you did or didn't. That more than likely, you'd be offering them a deal, you know, that judication withheld; community

17

service . . .

ES:    Can, can they withhold the judication at a federal level?

BH:    Sure, they can.

ES:    Okay.

BH:    Absolutely.

ES:    Okay.

BH:    Sure.

ES:    I thought it was, either, all or nothing at a federal level.

BH:    UI . . . no way.

ES:    No UI, no.

BH:    No way.  Absolutely not.  Absolutely not.  So, I mean, you know, they have to get to the
       point where they have, they think they have a winnable case, in the grand scheme of
       things, there are so many other abusive situations out there, I give
            you .   . .

ES:    UI

SC:    UI

ES:    In hine site, in hine site, UI well . . .

SC:    UI

ES:    I'm here to go over the bills.  But . . .

SC:    UI

ES:    in hine site, it should have been handled differently, from the beginning.  It should . . . as
       far as, as when Irene and Will came in here,

BH:    Irene and Will?  Who's that?

ES:    Ah, Irene Long and Will Mixin(?), the guys from HUD.

18

BH:    UI

ES:    Yeah, right, but

BH:    UI didn't even know that the problem existed.

SC:    UI

ES:    No, no, of course you wouldn't know anything about the mortgage end of it.

BH:    Yeah, but you didn't even tell me UI

ES:    No, the gifts . . .

BH:    . . . some problems with, you know, you didn't even tell me that there were problems with the verification of employment.

ES:    No, I agree with that.

BH:    UI  you didn't even know.

ES:    Of course I didn't know.

BH:    Okay.

ES:    But the gift funds is what we anticipated they were going to ask me about.

BH:    Okay.

ES:    And um . . .

BH:    Yeah, we talked about that.

ES:    Yeah.

BH:    Yeah, and, and . . .

ES:    And technically, technically, you're right.  Technically you're right that, um, I mean I find this amendment to the HUD that said that, well did you give money to the, um, buyers of the property?  I didn't.

BH:     So, then fine.

ES:    Technically, I, I, you know.

BH:    UI

ES:    If it's irrelative it's not the, it's not the buyer of the property.

BH:    Okay.

ES:    Yeah.

BH:    Okay. I mean, I understand this, again. That there's no question that if the rules are
       broken they have a right to UI you. However, looking at the big picture, if the rules were
       broken, the buyers got into the property, the buyers are making the payment, I mean,
       from what I understand, there's like three or four people that went in to default.

ES:    We, we really don't know. I, I don't talk to Mark anymore.

BH:    Okay.

ES:    I, I'm not on speaking terms with Mark,

BH:    UI

ES:    because I never thought I'd be involved in, I'm 27 years old and I never thought I'd be
       involved in some shit like this, you know?

BH:    UI . . . but if you. . . . look it . . .

ES:    You know.

BH:    I UI put it this way, if Mark did things in connection with the loan. . .

ES:     Um hum.

BH:    that you didn't know about, and that you're rightfully pissed off at him, to getting you
       involved in this thing . . .that's not the reason not to talk. Okay. Because I gotta tell ya
       that they don't, the government, the police, whatever, don't play fair. They would come
       to you and sit down in front of you with your lawyer and say, Mark Cohen said it was all
       Eric UI do it and he knew all about it and everything that was going on, and I told him
       that he's involved, UI. And Mark would probably never say that, because UI it's not true,
       and he wouldn't say it anyway.

ES:    Um hum.

22

BH:   I mean, I mean, obviously, you know, I told you, you tell them the truth, but you certainly don't want to volunteer stuff that, that, UI be a potential problem for you or something.

ES:   Um hum.

BH:   I mean. That's not your responsibility, you know. If they ask you a direct question, you answer the question, if they ask you . . .

ES:   UI. Like the fact, that they ask me a direct question, "Did I give money to, Mike Bowers," and I said, no, I could rightfully say, no.

BH:   UI But then that's fine.

ES:   Right, right.

BH:   UI they ask you, they could have asked you ten other questions, it might have been more difficult for you to answer or made you sweat, but if they already asked those questions, that's they're problem.

ES:   UI You don't have to volunteer it. Right.

BH:   Hell, no.

ES:   Okay.

BH:   Hell no.

ES:   Alright.

BH:   You know. And it wasn't like you were being evasive.

ES:   No, I met with them.

BH:   You know?

ES:   Right.

BH:   You know. I just think that, you know, given the volume of fraud that's occurred in south Florida,

ES:   UI

BH:   No, UI

ES:    Alright, okay.

BH:    I don't know that I could address that. . .

ES:    UI

BH:    UI

ES:    That's the UI of UI

BH:    Yeah, given that, that's existence UI, you know, they have an ongoing investigation. So what happens is, is they pick up, and get wind of, you know, a problem area and they go investigate it, and then, they may have 30 ongoing investigations against different companies, title companies, individuals, whatever. And they're gonna pick and chose who they're gonna go after. They only got so many people. Okay. So, they're gonna pick the UI

SC:    UI

BH:    Huh?

ES:    Right, UI Right.

BH:    Yeah, I mean that's just ridiculous, okay. I mean there's no economic way that these people were gonna be able to generate enough income from these properties, I mean. You may have bent the rules or been unaware of certain rules, okay.

ES:    Um hum.

BH:    The bottom line is you weren't selling houses to real buyers who were supposed to move into those houses and UI

ES:    UI

BH:    In never your wildest dreams did you expect somebody not to make their payments.

ES:    Right.

BH:    UI so, your conscious in that regard is clear, in fact, you're doing a good thing for people who, who, necessarily didn't have enough to money UI, didn't understand UI

ES:    UI, Right.

BH:    Yeah. Didn't understand the system. Didn't know what was going on.

ES:    Right.

BH:    I mean, I understand now that there's a thing that, UI

ES:    UI program.

BH:    Yeah.

ES:    Which allows the, which allows the seller to give the buyer a "gift."

BH:    Okay. So the bottom line is that, let's just say that they decide to prosecute you. Okay, and now they're in front of the jury and they're telling all these terrible things that they're claiming you did, which is, that you, indirectly gave this money. And they're saying that even though the rules don't say that you can't do it indirectly, you know, he knew that the buyer was going to get the benefit of this and, it's wrong, whatever. So your attorney stands up there and says, you know, Mr. Prosecutor,

Conversation interrupted by an unknown female intercom into the room.

BH:    Yeah.

UFe:   Richard Lyons on line 1.

BH:    Okay. Hey Richard. How are you? Yeah. We got . . . UI a long time.

ES:    I spoke to Richard yesterday. Is he an attorney?

BH:    UI

ES:    Ah, I'm sorry.

BH:    Okay. Tell me what it is. I'll try. Wait a minute, let me get a piece of paper and make notes. Go head. Yes. Okay. UI. Give me some more information. Who is the buyer, who is the seller? Okay. Right. Yeah. Automated UI. That's me. When did it close? UI You're kiddin me. Okay. Let, let me, let me tell you what I think happened. Um. Who is this seller into Richard? Oh, you don't have your UI in front of you. Okay. Could . . . that's it. That's it. Okay, that's, yeah, let me. Wait, let me tell me what's go . . . . what's happens here. You're gonna love this, cause Jeffrey UI otta get in trouble over this. Somehow, the deed and mortgage disappeared. Okay. I discovered, in fact, that, that somewhere along the lines it UI happened, you know, whether we sent it out, it got lost, whatever. I got Sabrina Richards to reexecute the mortgage document. Okay. I UI

30

called. Wait . . . let me tell you what happened. I didn't call up Ronnie UI. You know who Ronnie is . . . Okay. I call him the UI courthouse shark, or rat. Okay. I call up Ronnie and say look, your son, you know, got tied up in UI fees. He sold it to Sabrina Richards. Um, I need you to get me a new deed. In the interim, because we didn't record, in a timely fashion, Ronnie recorded a purchase money second mortgage outside the closing that I didn't know anything about. Okay. I tell him, or maybe I did, maybe, I shouldn't say that. Maybe it was on the closing statement and UI by one UI, I'm not sure, but, if it . . . . Then, then, then I didn't know about it, okay. So I said if you guys, you know, did this UI what I need you to do is get a corrected deed from Jeffrey. A new deed. And he needs to subordinate your mortgage through One Stop Mortgage. Ronnie tells me, basically, look it's only $3,000 or something, I'm not gettin paid, you pay me and, and, satisfy it. And I said, "bullshit." I'm not gonna do that. If . . . You shouldn't have done the second mortgage in the first place. Jeffery's legally obligated to give a new deed, you know, because it got lost. He has no legal excuse not to. And, you know, I'm not gonna be blackmailed. And where it got left is, a bunch of letters to Jeffrey and UI, UI for the deed, and, and UI and I got UI. So that's where we're at. I'm positive if I pull out my file, I UI reexecuted mortgage in my files from her that I never sent for recording, because I couldn't get the deed from Jeffrey. UI . . . I'll give it to you. But, you know, if, if, so you're suing Jeffrey Baron. UI you're not. Yes. Oh, okay. Well. Whose Betty? Oh, okay. Oh, Okay. Terrific. Well now that you know . . . Okay. I mean, I think that Jeffrey is in an indefensible position, that he's got to give up a deed. I mean there's no reason that he can't. He's been paid. It means executing a deed. And then the question is, I don't know if Ron told him to purchase money, or Jeffrey is . . . Okay and I think that Jeffrey is, and Jeffrey is an attorney. No. He's an attorney. Yeah, I mean. You know, I don't know, I don't if he's a member of the Florida Bar, but when I talked to Ronnie, you know how Ronnie is, I said Ronnie look, I messed up, it didn't get recorded on time. I said, I 'm not gonna take advantage of that fact. You know, just support me and go chase Sabrina for your money. I mean why should I, you know, because I lost some papers, you're gonna tell me it's going to cost me $3,000. It's not gonna happen. You know. So, I went and told my UI, what's your phone number. Yeah. Yeah but I, you see when we discovered this, I had a heart attack. So I made a photocopy in my file. I, I actually think that I went to her house and she had copies of the mortgage. Cause I had lost, you know it wasn't in my UI anymore, and, and made a copy and UI whited out the signatures and had her reexecute it and I think . . . I don't think so. I don't think I do. I don't think I do. But, I mean it's like there's no question in my mind. I don't see how Jeffrey could refuse to give up the deed he just paid. And, and the only . . . Yeah. Yeah. Well you have to do it anyway. Exactly. And, and how Jeffrey's not gonna subordinate his mortgage, I mean that was because . . . and he would let me talk to Jeffrey, you know Ronnie wouldn't. You know I couldn't get a hold of em. But you talked to Jeffrey directly? Oh, okay. The sister, right and an attorney, so. I will, I will go through my file. And, that's wonderful. So we'll get this taken care of and UI I don't have the title UI . Alright, Richard, thanks, bye-bye.

31

BH:   UI

ES:   I talked to Richard yesterday, actually.  Mr. Lyons.

BH:   Ah.

ES:   UI, I think

BH:   Yeah.

ES:   Yeah.  Because um.

BH:   He and I go way back.

ES:   Well, because, exactly the same as Annabel Georges?  There's was one problem with
      Title Express that they screwed up the . . .

BH:    Who did?

ES:   Title Express screwed up the, um UI

BH:   UI a closing. UI

ES:   Well, the legal . . . no I don't think he's foreclosing.  It's just a legal description problem.
      I think.

BH:   UI Why does he UI got the file UI

ES:   Well maybe, I

SC:   UI

BH:   UI  foreclosures, that's all they do.

ES:   Yeah, so ah . . . he's supposed to send me the corrected, um deed?

BH:   Deed for you to sign.

ES:   for me to sign.

BH:   Okay.

ES:   UI

BH:   He and I go back, 20 years.

ES:   Really.

BH:   Yeah.

ES:   UI . . . I mean, UI you have my new card yet?

BH:   No

ES:   UI . . . When do you think I can start giving you titles?  Not for awhile.  It's not a big deal, I found another title company but I'd like to send it to you.

BH:   UI

ES:   No, well I mean I'd like to send it to you.

BH:   Well, I'm not ready.  So I understand.  Okay?

ES:   You're not ready, I mean,

BH:   No.

ES:   Do you anticipate any time soon, or . . .

BH:   Let me tell ya.  I, I, I have spent probably $10,000 having my trust account audited.  Cause what happened is, when the hard drive crashed, all the records were lost.  So I had this person go back almost two years.

ES:   Wow.

BH:   And audit every check, every file, everything.

ES:   Oh my God.

BH:   And, we're actually up to September.  And everything is cool.

ES:   Up to September of this year.

BH:   Yeah.

ES:   That's nothing.

33

BH:    No, no I know. But here's the report. You know, of all of the like outstanding checks, okay. So we're going through, here's a check, January of '98' that's outstanding check. And here's all the file numbers, and so we're just going through and accounting for . . . UI

ES:    So you have to do that first before you . . .

BH:    Yeah, because, because I can't apply to an underwriter, first thing I an underwriter's going to say is let me see, you know UI letter UI statement on your trust account. And so, we're, we're almost done. But, yeah, UI

ES:    I mean, a month away, two months away, you don't even know.

BH:    Yeah, a couple of months.

ES:    Alright. Okay, let's go over

BH:    UI

ES:    Let's go over the bills.

BH:    UI

ES:    I mean I didn't mean to bring up UI

BH:    UI it's okay.

ES:    I'm like, UI a little panicked.

BH:    UI I just think, that in the grand scheme of things, and especially, if the biggest threat that you have, at all is, the "gift" letter, or the "gift fund." Okay.

ES:    Um hum.

BH:    And they've changed the statute to allow the seller. So, from the point that I'm trying to make is, they're gonna say, okay, on this date, Mr. Prosecutor, you're claiming that Mr. ES did something terrible and heinous, and, and forbidden. And over here, they passed the statues that says it's okay to do that, and you're saying that if he did it now, it's no good, but if he did it today, it would be alright.

ES:    Um Hum.

BH:    What do you think the jury's gonna do?

34

ES:    UI

BH:    The jury's gonna say, you know what . . . you sell houses to people, you did a good thing, 100 people came in there and UI they're so happy with their houses and they got 10 people that defaulted and four people, UI national average and all this kind of stuff.  UI say not guilty.

ES:    Okay.

BH:    It, it just . . .

ES:    I'm so much more paranoid than that.  UI Okay,  good.

BH    I understand that you are. . . but I mean, just think logically.

ES:    Alright.

BH:    You're sitting there as a juror,

ES:    Uh huh.

BH:    You're sittin there and they're trying to put this guy in jail.

ES:    Uh huh.

BH:    Okay.  And they're saying, the law is this way, and then the law changed, and then the hole thing that we're trying to put him in jail for is something that is now allowed.

ES:    Right.

BH:    Would you put a guy in jail UI

ES:    Of course not, I wouldn't, but.  No.

BH:    UI neither would anybody else, then, they can't even prove, I don't think, that you did anything wrong.

ES:    Um hum.

BH:    Cause you did your . . .

ES:    I did it to the . . . .

35

BH:    Relatives, you're telling me.

ES:    Relatives. Right. Right. Right.

BH:    So.

ES:    Alright. So. Um. I don't have a problem with this bill, so that's the first one. This one right here. I don't have a problem with that one.

BH:    Good.

ES:    Alright, that's the one. Well, no, no, no, the total is not UI You gave me a courtesy UI

BH:    Yeah, I remember, $300 bucks.

ES:    Alright.

BH:    UI It's only from. . . .

ES:    No, no, that's fine. No, no. UI There's no limit on a UI

BH:    From 90, wait, wait, that was '97'. What was the date of this bill? I'm just curious. August of '97.'

ES:    Yeah, well, you didn't have UI. So.

BH:    What does that have to do with it.

ES:    Well, I was gonna say, cause

BH:    How many times you told me you were gonna pay it.

ES:    Alright.

BH:    C'mon.

ES:    Alright.

BH:    Okay, so that's that one.

ES:    Okay. That one I don't have a problem with.

BH:    Okay, good.

ES:     Okay, this one I have a problem paying UI.  First of all, I paid you, um $250

BH:     Yeah.

ES:     and $250.  I paid you $500.  Okay.

BH:     And those amounts were credited to the UI bill.

ES:     No, I UI pay that. Absolutely.

BH:     UI

ES:     They were not.

BH:     Yeah they were.

ES:     No they weren't.  I got charged $1500 for 10 phone calls, or for 5 phone calls.  That's crazy, and half the phone calls were to Mark.  I got charged $1500 then?

BH:     Let me just look at the bill.  UI not half the phone calls are Mark, you got, there's one, there's a lot of phone calls to Mark.

ES:     Alright.

BH:     What are you talking about?

ES:     Okay.

BH:     There's one phone call, c'mon.

ES:     Alright, but how many phone calls were there?  There was one, two . . .

BH:     Wait a minute.  There was one, two, three, four, five, six, seven, eight, nine, ten . .

ES:     Ten.

BH:     UI

ES:     Alright, and for ten phone calls I get charged