UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6168-CR-FERGUSON

UNITED STATES OF AMERICA,

Plaintiff,

vs.

BRUCE HOLLANDER,

Defendant.

_____/

NIGHT BOX
FILED

JAN - 2 2002

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

## RENEWED MOTION FOR JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND INCORPORATED MEMORANDUM OF LAW

The Defendant, BRUCE HOLLANDER, by and through his undersigned attorney, respectfully moves this Honorable Court for an Order granting a Judgment of Acquittal, or in the Alternative an Order granting a New Trial as to Counts 1-12.[1]    As grounds therefor, the undersigned would show as follows:

A.  **MOTION FOR JUDGMENT OF ACQUITTAL**[2]

Rule 29, Fed.R.Crim.P., provides in pertinent part:

The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of

---

[1] On November 20, 2001, the jury returned a verdict of guilty as to all 13 counts of the Indictment. Defendant sought, and this Court granted, 30 days leave within which to file post-verdict motions, thereafter, upon Defendant's further request, this Court extended the filing date of this Motion to January 3, 2002.

[2] In the interest of judicial economy. Defendant adopts all arguments previously made with respect to his oral Motions for Judgment of Acquittal. The Court reserved ruling on Defendant's initial and renewed motions.

such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the government is not granted, the defendant may offer evidence without having reserved the right.

     *          *          *          *          *

If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7-day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal....

A motion for judgment of acquittal tests the sufficiency of the evidence against the accused, "...and avoids the risk that a jury may capriciously find [him] guilty." Wright, Federal Practice and Procedure, §461 at p. 243. On a motion for judgment of acquittal, the district court views the evidence in the light most favorable to the government in determining whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. United States v. Ward, __ F.3d __, (11th Cir. 2001) 2001 WL 1538059 (11th Cir. (Fla.)). Here, it would appear as if the jury's guilty verdicts are both capricious and irrational.

This is not exactly your "run-of-the-mill and "Federal prosecution. The essence of the Government's case was that Hollander knowingly involved himself in a scheme to defraud HUD and helped to promote the scheme by a) (issuing false and misleading title commitments), b) incorrect HUD-closing statements and addenda, and c) intentionally issuing checks he knew were going to be recycled back to other, later home purchasers. The evidence at trial however was less than crystal clear and with respect to several of these issues, exculpatory. Moreover, the case law specifically supports the entry of a Judgment of Acquittal on counts 1-12) Thorn v. United States (11th Cir. 1994), and ergo also with respect to Count 13, see United States v. Christo, 129 F.3d 578 (11th Cir. 1997).

## TITLE COMMITMENTS AND HUD-1s

Defendant/ATS was obligated to produce a title insurance policy, which clearly and unequivocally insured the homeowner(s) as correct record title owner(s) of the real estate, and similarly insured the lender's first mortgage position. The title commitments, which are nothing more than a contract, or promise, to produce a particular insurance policy, did exactly that: at the end of the day, after each home was closed, all documents signed, funds transferred, and appropriate documents recorded, each homeowner received a title insurance policy guaranteeing his/her/their new home was owned by him/her/them and the lender—Corinthian—always received an insured first mortgage position. No one-not the owners, Corinthian or HUD-ever relied on the title commitment for anything except perhaps the lender assuring itself that the homeowners' names were spelled the same on the title commitment as on the loan documents (promissory note, mortgage, et al.) and that the legal description on the deed and mortgage was the same as the legal description on the title commitment.

It is clear from the testimony as a whole, that no one at HUD ever even looked at-or cared—about the title commitments. The Government's evidence with respect to the lenders reliance on and use of the title commitments was—at best—sparse to non-existent.[3] In fact during closing argument Defendant's counsel brought to the jury's attention that the only typical lender document in evidence which apparently referenced the title commitment (an example of which, displayed to the jury from Gx 44, Bates #03509), was the lender's "Document Control List" DCL which referenced four items under the "title commitment" section:

1.    **Verify borrowers name and sellers name** [Emphasis Added]
2.    Check for homes' association dues
3.    Verify company rating

---

[3]  Defendant does not recall seeing any title commitments or policies in the HUD files placed in evidence by the Government.

4.    **Verify legal description** [Emphasis Added].

It was also established at trial that the HUD Direct Endorsement Approval was already given by the lender for HUD purposes **before** the title commitment was ever even forwarded to the lender and certainly before the title commitment was even issued by ATS (see Ex A attached hereto). In sum, Defendant is entitled to a Judgment of Acquittal because the title commitments were not relevant, important, significant, material to, or relied upon by, either Corinthian, in making its decision to lend the money necessary to fund the mortgage, or to HUD, with respect to insuring the loan under the HUD Direct Endorsement Approval procedure.

Defendant's expert witnesses, James Mack and Ralph Mills (who between them have handled more than 80,000 real estate closings) made it abundantly clear that while they might not have conducted or managed their business affairs, title commitments, and closings the way Defendant did, nonetheless, based upon custom, usage, and industry practice, there was no evidence of bad faith or criminal intent:

1.    The title commitments were not final, but rather "work in progress".

2.    The decision to extend a loan was made by the mortgage company's underwriter well in advance, and independent, of the issuance of the title commitment.

3.    It is highly unlikely that anyone at the lender's offices (either in underwriting or closing) even looked at the title commitments before the final closing and probably never. This is evidenced by the fact that in the allegedly offending "B" to "C" title commitments, ATS listed the encumbrances of record which impaired "A"'s Title, and yet none of the payoffs necessary to clear title in favor of "C" and Corinthian were ever listed on the "B" to "C" HUD-1 closing

4

statement and addendum.[4] Had anyone from Corinthian or HUD been interested in or reliant upon the title **commitment** a quick comparison of the schedule of items needed to be paid off or satisfied, to the disbursement side of the HUD-1 closing statement would clearly have raised questions as to whether this was a simultaneous ("A" to "B", "B" to "C") transaction or not. Defendant's inclusion of these items in the title commitment further negates the Government's proof. That Defendant believed (or suspected) that no one even looked at the title commitments hardly substitutes for proof of criminal intent beyond a reasonable doubt.[5]

4.    The dates on the HUD-1 statements (and addenda) did not necessarily evidence the date on which the transactions actually closed. This is real world, not some hypothetical reality the Government would like to impose by the antiseptic application of rules, regulations and the law. Anyone who has ever purchased or sold a home (and certainly anyone who is engaged in more than one real estate transaction) knows that rarely-if ever-do things go smoothly at a closing. Far more often then not (as explained by both Mr. Mack and Mr. Mills) a document is missing, a figure is wrong, a signature is need, a check misplaced (or forgotten—or not available) on the date and at the time of closing. In the real world you do not redo, re-date, re-sign all the documents. You sign and date as scheduled. The title company/agent holds the documents until the missing items (or money, or even gift check) surface. Hence total reliance, according to Defendant's witnesses, on the accuracy of a date of a HUD-1 or Addendum as **the** date of closing is a dangerous and unacceptable substitute for proof beyond a reasonable doubt.

---

[4]    Corinthian's closing instructions, ¶6, dealing solely with the title insurance policy, required ATS to deliver a mortgagee title insurance policy which insured that Corinthian had a valid first mortgage lien. This was done in each and every case. The only mention of the title commitment in the instructions is in ¶11, which required that the legal description be accurate.

[5] Corinthian's closing instructions required ATS to fax the HUD-1 for Corinthian's approval **prior** to closing.

5.      "Flip" or simultaneous transactions are **not** per se illegal.  The kind of "flip" transaction HUD, lenders and the Government deem illegal did not occur here.[6]  What we have here is "B" buying from "A" and selling to "C" but using "C's" money to purchase the property from "A."  The price between "B" and "C" was always at fair market value or at least independent third-party appraisal value.

As recently as November, 2001, HUD's Office of Inspector General put out a "Special Fraud Alert" in which the dangers of fraudulent "flip" deals were published.  The most significant warning given was that the "flipper" buys "cheap" and sells for a price that is much more than the property is worth.  **That did not occur here**.  Yes, **ARC bought below market**-after careful research-**but the resale price generally was never more than 20% higher (the average was 17.46%) and always at or below the independent third-party appraised value.**  Evidence of this is found in the Government's own Exhibits (even though the Court did not permit the Defendant to argue appraised values to the jury) (see Defendant's Ex B attached hereto, which is the demonstrative aid, prepared from the contents of the Government's Exhibits in evidence, specifically for use in closing argument to the jury, but which the Court prohibited Defendant from using; see pps. 16 and 17, infra.).

6.      It is not illegal to sell a home you do not own ("B" to "C") provided you acquire title ("A" to "B") before "C's" ownership is placed of record.[7]  Despite this obvious fact of real life, the Government and its witnesses continued to state "it is illegal to sell something you do not own."  In the abstract that may be true.  In real life that is simply not the case and it happens every day.  What **is** illegal is failing to produce good, valid title (to the home and the first mortgage), which **never**

---

[6] The "traditional" "flip" transaction is a simultaneous real estate closing of a piece of property at a highly inflated price and usually with straw buyers.

[7] Even placing "C's" ownership of record, before "B" acquiring title from "A," is not illegal under Florida's Doctrine of

6

happened here. The homeowner and lender always received, from ATS, that which ATS was contractually obligated to produce:  Good title.

### GIFT FUNDS CHECKS

Insofar as the four files with "Gift Funds" noted on the check, it is clear the jury failed to rationally consider the following evidence and logical conclusions:

1.      Georges (Gx 8):  Ms. McGhie acknowledged **she** issued the $4,540.00 gift fund check in response to ARC/Silverman's written demand because although Silverman brought a cashier's check for $4,540.00 to the closing, it was payable to the wrong party, hence the need for the replacement gift check.

2.      Josheba Lindor (Gx 28):  Ms. McGhie acknowledged that on November 26, 1997 **she** wrote the $6,800.00 check and **forged** Defendant's signature, all without Defendant's knowledge, consent and approval.

3.      Rodriguez (Gx 12):  Two checks were written, one for $3,000, one for $1,300.00.  The $4,300.00 gift check for the closing was dated October 20, 1997.  The $3,000.00 and $1,300.00 checks, although dated October 17, 1997, were not cashed until October 21, 1997, one day after the closing.  The two "proceeds" checks were cashed one day **after** the $4,300.00 gift check was purchased, hence the $3,000.00 and $1,300.00 checks could not possibly have been used to purchase the $4,300.00 gift check used at the October 20, 1997 closing.

4.      Carswell (Gx 4):  A $7,000.00 check to Eric Silverman, dated November 25, 1997 (cashed on 11/26/97) was noted "Gift Funds."  The actual gift check for $6,194.00 was dated November 25, 1997, and thus obtained one day **before** the $7,000.00 check to Silverman was cashed.  It is clear, therefore, that this $7,000.00 could not have been used to buy the $6,194.00 gift

7

check.  The Government's theory that the $6,800.00 of the $7,000.00 was used for the Josheba

Lindor transaction, makes no sense because, as we know (but the jury irrationally overlooked) that

on November 26, 1997, Ms. McGhie **forged** Defendant's signature on a check for that very

amount. In addition, Silverman testified that this $7,000.00 check was deposited into Jean Lindor's

bank account.  Jean was an employee of ARC and also a relative of Josheba, hence it was perfectly

legal for Jean to make a $6,800.00 gift to his relative Josheba, even though he worked for/with

ARC. It appears as if the Government is attempting to match  the dollars on checks with its theory,

without any concern for the facts. Moreover, with respect to ATS checks with the notations "gift

funds"  or  "net  proceeds"  as  being  evidence  of  Defendant's  promotion  of  the

ARC/Silverman/Cohen scheme (and hence Defendant's criminal liability for money laundering),

Defendant reminds this Court of Cohen's testimony: "Silverman ran out of money," which was

clearly and undeniably refuted by Dx 15 and thus the proof as to Count 13 is insufficient as a matter

of law especially once the Court grants the Motion for Judgment of Acquittal as to Counts 1-12.

See Christo, supra.

## **GENERAL FAILURE OF PROOF**

The Government failed to introduce (or if it did Defendant does not recall) any evidence

that HUD in fact issued its insurance certificates (other than the Direct Endorsement Approval)

for each of these loans.  If that is so, than the Government's HUD counts (7-12) must fall as a

matter of law, albeit on a technicality.

The evidence clearly established that Cohen and Silverman did not disclose any of their

fraudulent mortgage activities to the Defendant until late January, 1998, after 41 of the 42 closings

had already occurred.  Moreover, with respect to the last closing, May 18, 1998 (4 months after

ARC terminated its business relationship with Hollander/ATS), although the handwritten title notes (which did not reflect a flip transaction), were drafted by Defendant, it was attorney David Javits, not the Defendant/ATS, who issued the Title Commitment (and Policy). In fact, the evidence at trial was undisputed that Defendant was not even in the country at the time of the last closing. These highly relevant facts were obviously, inexplicably, and improperly overlooked by the jury in arriving at the verdicts in this case.

Count 1 charged Defendant with conspiracy (18 U.S.C. § 371). As charged (Mail and Wire Fraud, 18 U.S.C. §§ 1341 and 1343), proof of materiality was required. Including false statements to HUD (18 U.S.C. § 1010) in Count 1 does not eliminate the materiality requirement. The Government failed to prove materiality. Defendant incorporates his argument below with respect to Counts 2-12. Defendant is entitled to a Judgment of Acquittal on Count 1.

Counts 2-6 charged Defendant with wire fraud (18 U.S.C. § 1343). Proof of materiality is required. The Government failed to prove that the title commitments were material, or relied upon by either Corinthian or HUD, hence a judgment of acquittal on Counts 2-6 is required.

The Count 2 wire communication is alleged to be a "[Title] Fund Commitment" to Corinthian. The title commitment, as a matter of law and as shown at trial, was neither material to, nor relied upon by, Corinthian. The Count 3 wire communication is alleged to be the HUD-1 to Corinthian. There was no proof at trial that the pre-closing faxed HUD-1 was material to, or relied upon, by Corinthian. A judgment of acquittal as to Count 3 is required.

With respect to Counts 4-6, the wire communication is alleged to be a wire transfer of funds. There is scant, if any, proof of the wire transfers and, even if so, the wiring of funds was not based on any material documents submitted to Corinthian. Judgments of acquittal are

HIRSCHHORN & BIEBER, P.A., DOUGLAS CENTRE, PENTHOUSE ONE, 2600 DOUGLAS ROAD, CORAL GABLES, FL 33· 4, TEL (305) 445-5320, FAX (305) 446-1766

appropriate on these Counts.

Counts 7-12 allege false statements to HUD (18 U.S.C. § 1010). The Court has determined, based on DeCastro v. United States, 113 F.3d 176 (11th Cir. 1997), that proof of materiality is not required. However, Defendant respectfully disagrees for the following reasons:

1.     As alleged: "Defendant did ... knowingly and willfully make, pass, utter and publish statements ... knowing the same to be false ... with the intent ... and for the purpose of **influencing** the actions of HUD." [Emphasis Added]. As argued earlier, Defendant's conduct could not possibly, and did not, in fact, **influence** the action of HUD. HUD acted on the basis of Corinthian's conduct, and Defendant's actions did not, and could not possibly have, influenced the lender. See also Gevinson, infra (materiality alleged in substance, even if not explicitly).

2.     While DeCastro, supra, appears to be the law of this Circuit, Defendant contends it is not well reasoned, (nothwithstanding United States v. Wells, 519 U.S. 482, 117 S.Ct. 921 (1997)), in view of the later United States Supreme Court decision in United States v. Neder, 527 U.S. 1, 119 S.Ct. 1827 (1999).

3.     Like Gevinson v. United States, 358 F.2d 761, 763 (5th Cir.) cert. den. 385 U.S. 823, 87 S.Ct. 51 (1966), while not expressly alleged in the Indictment, materiality is alleged in substance and thus, as a matter of Fifth Amendment Due Process, proof of same ought to be required before conviction.

4.     As a matter of Fifth Amendment Due Process of Law, whenever one is accused of criminal conduct based on an alleged false statement, the Government ought to be required to show that the offending statements (here the title commitments' and HUD-1 Settlement Statements and Addenda) are material as a matter of law, that the offending

10

documents were relied upon by someone, and that the document was important or significant enough, to a reasonable person, in deciding whether to engage, or not, in the particular transaction. Here we have documents that, right or wrong, true or false, complete or draft, final or mere work in process, no one on the "receiving" (and there is scant, if any, proof of receipt) end actually saw, reviewed, relied upon, and acted accordingly. Remember, Corinthian rendered its decision to grant the mortgage loan and affix the HUD Direct Endorsement Approval well before the title commitment was even prepared and even before it was faxed (or otherwise tendered) to Corinthian.[8]

It is hard to imagine Bruce Hollander going to prison for several years on the basis of these facts and the law. Perhaps that is why Thorn v. United States, 17 F.3d 325 (11th Cir. 1994) was decided, is still good law, and applies to this case.

It is important to recite the facts in Thorn in order to understand Thorn's application here. In December, 1984, Thorn (and a co-defendant) obtained a $1,000,000 loan which was to be secured by a mortgage on real estate Thorn and the co-defendant were buying. The property was being purchased from the Franks. Thorn (an attorney), as agent for Attorney's Title Insurance Fund (ironically, the same title underwriter as in this case), was to provide title insurance showing that the lender, Life Savings & Loan ("Life") was to have an "undiluted first [mortgage] lien" on the property. Three of the four existing mortgages were satisfied at the time of closing. One, however, remained of record, thus making Life's "undiluted first [mortgage] lien" in fact a second mortgage. This was done willfully and intentionally by Thorn. See 17 F.3d at 326.

At the December, 1984 closing, Thorn did not tender a title insurance policy but, rather, only a written commitment to provide a final title insurance policy which was to have shown Life

---

[8] Defendant does not recall any proof that the title commitments were faxed (or even tendered) to Corinthian.

as the first mortgage holder. Thorn had intentionally deleted, from the title commitment (Schedule B), the requirement to obtain a satisfaction of the $350,000 Frank mortgage which, still of record, was clearly superior to Life's $1,000,000 mortgage (and contrary to the agreement between the parties). The net effect of this was to permit Thorn to receive the $1,000,000 mortgage proceeds, pay off three of the four existing mortgages, not pay off the $350,000 Frank mortgage, trick Life into thinking it had a first mortgage when, in reality, Life only had a second mortgage after the closing. Thorn thus was able to use $350,000 of the $1,000,000 mortgage proceeds until nine months later when, after discovery and threat of default by Life, Thorn refinanced the project, paid off Frank's $350,000 first mortgage, and Life's $1,000,000 second mortgage with a new loan.

Thorn was indicted and charged with conspiracy (18 U.S.C. § 371), ten counts of bank fraud (18 U.S.C. § 1344) and four counts of false statements to a federally insured financial institution (18 U.S.C. § 1014). At Thorn's first trial, the District Court directed acquittal on two of the four § 1014 counts and declared a mistrial (due to jury deadlock) as to the other counts. At Thorn's second trial, the jury convicted him of one false statement and acquitted Thorn (and his co-defendant) of all other counts. The District Court eventually granted defendant's post-verdict Motion for Judgment of Acquittal (which was the subject of the appeal to the 11th Circuit). The District Court was highly critical of the lender's representative's conduct at the December, 1984 closing. Id. The 11th Circuit affirmed the District Court. Id. at 328.

Defendant acknowledges that while Thorn was prosecuted and the Court acquitted, post verdict, for a violation of § 1014 (which requires a showing of materiality) unlike Defendant's convictions which include violations of § 1010 (which currently do not appear to require a

12

showing of materiality), the District Court's acquittal and the 11th Circuit's affirmance of same were not based on the materiality vel non issue, but, rather, the Thorn Court's conclusion that: "There is no way that a crime was committed in this ...." Id. at 326. If Thorn did not commit a crime, considering Thorn's intentional conduct in deleting the Frank mortgage and thus tricking Life into believing it had a valid first mortgage, it is hard to see how Hollander committed a crime with respect to the title commitments sub judice, in view of the fact that both the owners and lenders got exactly what they were to get, and in a timely manner.

Williams v. United States, 458 U.S. 279, 284, 102 S.Ct. 3088, 3091 (1982) requires that the defendant make a false statement for the purpose of influencing in any way the action of a financial institution. See, Thorn at 327. We know here Defendant's conduct could not and did not influence either Corinthian or HUD.

The 11th Circuit concluded that Thorn did not make a false statement within the meaning of § 1014. Id. If that is so, logically, how can Defendant be held accountable here, even though this is a § 371, § 1344, and § 1010 prosecution? The 11th Circuit correctly pointed out:

> The only effect of Thorn's failure to list the Frank mortgage in Schedule B was that the title insurance covered any loss Life might suffer as a result of the priority the Frank mortgage had over Life's lien because of Thorn's failure to carry out his commitment to Life that the Frank mortgage would be released or subordinated.
>
> In short, Thorn made no statement in the title policy regarding the Frank mortgage and did not falsely state that it had been released or was no longer a lien prior to that of Life. The policy was exactly what it purported to be and no more: it insured Life against any losses it might suffer as a result of any prior encumbrance on the mortgaged property, except for those specified in Schedule B. It made no representations or statements regarding the Frank mortgage, and the failure to list that mortgage on Schedule B did not constitute an implied statement that the Frank mortgage had been released or subordinated. Thorn at 327-328.

13

Sub judice, while showing ARC as record title owner in an undated title commitment (upon which no one relied), Defendant/ATS was careful to detail each encumbrance, lien and judgment necessary to clear title from "A" in order for Corinthian to have a valid first mortgage and to insure that "C" had valid title ownership. Where is the crime?

The Government's case was predicated on the theory of implied false statements. The 11th Circuit in Thorn rejected that theory. The 6th Circuit in United States v. Waechten, 771 F.2d 974 (6th Cir. 1985), a false statement to HUD under § 1010 case, likewise has rejected that theory. As the 11th Circuit stated, in conclusion in Thorn at 328, Thorn's failure to list the Frank mortgage did not constitute a false statement that the Frank mortgage had been released and, therefore, Thorn made no false statement to the lender. That reasoning ought to apply here with respect to Counts 1-12, as the omission of the requirement to obtain a deed from "A" to "B" is likewise not a false statement, either express or implied. Once acquittal is granted as to Counts 1-12, Count 13 must likewise fall, see United States v. Christo, supra, as regardless of Defendant/ATS' check writing activity, the proceeds could not have come from a specified unlawful activity, or have been issued with the intent to promote conduct which is not found to be criminal.

Finally, as a matter of Fifth Amendment Due Process of Law, the materiality issue has been preserved, not only at the conclusion of the Government's case, but by Defendant's request that the jury instructions include materiality as an element of the § 1010 Counts.

**B.     MOTION FOR NEW TRIAL**

Rule 33, Fed.R.Crim.P., provides in pertinent part:

> The Court, on motion of a defendant, may grant a new trial if
> required in the interest of justice.... A motion for a new trial... shall
> be made within seven days after verdict ... or within such further

time as the Court may fix during the seven day period.

### 1.    Interests of Justice/Sufficiency and Weight of Evidence

A.    Defendant contends the verdict is contrary to the greater weight of the evidence and further that the verdict is contrary to both the law and the evidence.

B.    The decision to grant or deny a motion for new trial based on the weight of the evidence is within the sound discretion of the trial court. "A district court has much more power to grant a motion for new trial than it does to grant a motion for judgment of acquittal." Ward, __ F.3d ____ (11th Cir. 2001), 2001 WL 1538059 at 2. The district court's decision will be set aside only for a clear abuse of that discretion. Id. Granting a new trial based on a finding that a jury's verdict is contrary to the weight of the evidence does not violate the double jeopardy clause. Freer v. Dugger, 935 F2d 213, 217 (11th Cir. 1991).

C.    The 11th Circuit has very recently stated that "[i]n evaluating a motion for a new trial, **'[a] district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'"** [Emphasis Added]. Ward, 2001 WL 1538059 at 2, citing United States v. Kellington, 217 F.3d 1084, 1095 (9th Cir. 2000) (quoting United States v. Alston, 974 F.2d 1206, 1211 (9th Cir. 1992)).

Considering the great personal liberty interest Government witnesses Mark Cohen and Eric Silverman had in the outcome of this case, their testimony ought to carry little weight. Similarly, Libby McGhie was shown to have significant bias against the Defendant. On the other hand, Defendant's expert witnesses, James Mack and Ralph Mills, made it clear: the title commitments and HUD-1 statements at issue were not necessarily consistent with criminal intent or fraudulent conduct. Regretfully, the jury either improperly ignored – or overlooked – this

testimony. It is appropriate, therefore, to order a new trial under these circumstances, especially when one considers the errors listed below.

**2.    Evidentiary Rulings**

The Trial Court erred with respect to the following evidentiary matters during the trial of this case.

A.    The Trial Court unduly limited Defendant's cross-examination of several Government witnesses, including, but not limited to, precluding meaningful examination of Ms. McGhie with respect to her own wrongful conduct and bias against the Defendant as set forth in Defendant's proffer on November 8, 2001.

B.    Precluding admission of Dx 5 (Rivera Title Policy), which would have established that Defendant's title insurance underwriter issued this title policy even **after** discovery of the alleged fraud and apparently despite the allegations, and Dx 8 (Certified Title Searches), which would have shown the current record status of each property at issue (i.e., foreclosure, refinancing, resale).

C.    Precluding Defendant from examining witnesses with respect to the appraised values of the individual properties. (See Ex B).

D.    Precluding Defendant from bringing to the jury's attention, referencing, or even arguing, the appraisals, which were in the Government's exhibits introduced into evidence, during trial and closing argument. (See Ex B).

E.    Precluding cross-examination of Corinthian's representative, Ms. Davidson, regarding the current payment, record, and foreclosure status of each of the 41 HUD insured properties at issue.

16

F.    Granting the Government's pretrial Motion in Limine.

G.    Precluding the Defendant from introducing evidence regarding the foreclosure rate of the 125 HUD insured properties at issue not being substantially different (and perhaps even less than) the HUD national and South Florida rate of foreclosure.

H.    Improper admission of 404(b) evidence (similar transactions -- Wesley Grant and Richard King; Alleged violations of Attorney's Title Insurance Fund internal policies, lender/underwriter internal policies, and Florida Bar Rules; and ATS' failure to have the proper State of Florida license at the time of the transactions in question).

I.    Precluding admission of testimony regarding the fair market value of the properties at the time the transactions were closed.  This remains a significant issue as the Government's submission to the Probation Department references, at least twice, that the properties at issue were sold at "greatly inflated" and "inflated" prices.  Defendant contends that the jury should have been entitled to have the benefit of testimony from the appraiser (who Defendant had under subpoena for trial), or at least the appraisals which were in the Government's own exhibits introduced in evidence.  (See Ex B).

3.    **Non-Evidentiary Errors/Issues:**

A.    The Trial Court erred in overruling Defendant's objections to certain jury instructions as given and in refusing to give certain of Defendant's requested jury instructions as set forth more fully in the record at the charge conference and as renewed after the jury was instructed.  In addition to the theory of defense instructions (Requests Numbers 3, 4 and 6), which the Court refused to give, the Court refused to instruct the jury on basic legal matters which we, as lawyers, understand, but which perhaps the average juror might not.  For example, the Court

17

refused to instruct that a closing agent must disburse as directed (Request No. 7); Simultaneous closings are not (per se) illegal (Request No. 8); A title commitment is nothing more than a contract to provide title insurance (Request No. 10); It is not illegal to sell real estate you do not own, provided you acquire title to it (Request No. 12); Implied misrepresentations – within the context of this case – in the title commitments are not unlawful (Request No. 11); When a real estate transaction is deemed closed (Request No. 13); Defendant was not on trial for alleged violations of Florida Bar Rules or the internal policies of the lender and title insurance fund (Request No. 9); And finally, the court's refusal to include materiality as an element of the § 1010 Count.

      B.     The Trial Court erred in denying Defendant's various motions for mistrial as set forth in the record. By way of illustrative example, on November 7 the prosecutor elicited testimony that ATS was not licensed, despite an earlier ruling on Defendant's Motion in Limine precluding same. Similarly, the prosecutor referred to land "flips" as being illegal, in questions to a Government witness, when the legality vel non of the "flips" should not have been an issue for the jury but rather one, of law, for the Court. The prosecutor also improperly referenced, in questions to the Government's witness, that the title commitments were "deceptive" when the issue of whether the title commitments were "deceptive" or not was a matter for the jury.

      C.     The Court improperly precluded the Defendant from arguing to the jury, that it could consider the fair market, or appraised, value of the properties and compare those values to the purchase prices of the 41 HUD insured houses at issue. (See Ex B).

      D.     Improperly precluding the Defendant from arguing the status of each of the 41 properties (foreclosure/refinancing/additional financing/satisfactory payment history/resale). Parenthetically, Defendant observes that the Government's submission to the

18

Probation Officer in connection with the Presentence Investigation Report, includes several references to the overall status of the properties at issue (foreclosure/variable interest rate payments, etc.).

### 4.    Prosecutor's Conduct

In addition, the Defendant should be granted a new trial because of the combined effect of the following:

A)    The Government's failure to introduce the Corinthian loan files, which gives rise to the negative inference that the contents of those files were inconsistent with the Government's theory of prosecution (i.e., no showing that commitment for title insurance was material to, or relied upon, with respect to true record title ownership by Corinthian or HUD). See, for example, Gx 44, Bates No. 03509, Corinthian, Quality Control File.

B)    The Government's continued, incorrect, legal and factual position that "flip" transactions were per se illegal, and that "you can't sell something that you don't own."

C)    The Government's persistence in a theory of prosecution (Corinthian never would have made these loans if it knew these were "flip" transactions), which was inconsistent with the Government's own witness testimony: (Ms. Davidson:  Corinthian would probably have reviewed the value of the property to satisfy itself that Corinthian's mortgage was secure, and not necessarily have refused to fund the loans).

D)    Government's improper elicitation of testimony from Ms. McGhie that Defendant permitted "phony" escrow letters to be utilized, yet the Government failed to introduce a single such letter to corroborate that statement.  Why?  Because it never happened!

19

E)    The Government presented its theory of prosecution (the homeowners were cheated), at the same time the prosecutor successfully prevented Defendant from introducing evidence and arguing that the homeowners received fair market/appraised value and thus were not cheated.

While several of the above noted errors are, in and of themselves, not sufficient to warrant a new trial, the accumulated effect and totality of errors mandate granting the relief requested.

WHEREFORE, Defendant, BRUCE HOLLANDER, prays that this Honorable Court will grant his Motion for Judgment of Acquittal, or in the Alternative, Motion for New Trial, and such other relief as is just and proper.

Respectfully submitted,

HIRSCHHORN & BIEBER, P.A.
Attorneys for Defendant HOLLANDER
2600 Douglas Road, PH One
Coral Gables, FL 33134
Telephone #: (305) 445-5320
Facsimile #: (305) 446-1766



By: _____
JOEL HIRSCHHORN
Florida Bar No. 104573

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via facsimile and U.S. mail this 2nd day of January, 2002, to Jeffrey Kaplan, Esq. , Assistant United States Attorney, United States Attorney's Office, 500 East Broward Boulevard, Seventh Floor, Fort Lauderdale, FL 33301.

_____
JOEL HIRSCHHORN

HIRSCHHORN & BIEBER, P.A., DOUGLAS CENTRE, PENTHOUSE ONE, 2600 DOUGLAS ROAD, CORAL GABLES, FL 3(  34, TEL (305) 445-5320, FAX (305) 446-1766

**Ex. A**

U.S.A. v. Hollander

*Case No. 00-6168*

## CHRONOLOGY: From HUD Direct Endorsement Approval to Closing

| Owner | Date | Item | Bates # |
|---|---|---|---|
| Betye Gx 3 | 5/29/97* | HUD Direct Endorsement Approval | (409) |
| | 5/21/97 | Lender Closing Instructions Sent to ATS received 5/20/97 | (66-69)+(83)+(191-196) |
| | 5/21/97 | Closing /HUD-1 | (151-152) |
| Carswell Gx 4 | 11/21/97 | HUD Direct Endorsement Approval | (865) |
| | 11/21/97 | Lender Closing Instructions Sent to ATS | (643-645) |
| | 11/24/97 | Closing /HUD-1 | (650-651) |
| Dimanche Gx 5 | 6/25/97 | HUD Direct Endorsement Approval** | (1277) |
| | 6/26/97 | Lender Closing Instructions Sent to ATS | (987-991) |
| | 6/26/97 | Closing /HUD-1 | (992-993) |
| Ducatel Gx 6 | 12/30/97 | HUD Direct Endorsement Approval** | (1685) |
| | 1/6/98 | Lender Closing Instructions Sent to ATS | (1434-1438) |
| | 1/7/98 | Closing/HUD-1 | (1496-1497) |
| Francois Gx 7 | 9/23/97 | HUD Direct Endorsement Approval** | (2107) |
| | 9/23/97 | Lender Closing Instructions Sent to ATS | (1869-1873) |
| | 9/25/97 | Closing/HUD-1 | (1715-1716) |
| Georges Gx 8 | 9/8/97 | HUD Direct Endorsement Approval | (2552) |
| | 9/10/97 | Lender Closing Instructions Sent to ATS | (2350-2353) |
| | 9/11/97 | Closing/HUD-1 | (2154-2155) |
| Mike Gx 9 | 10/9/97 | HUD Direct Endorsement Approval** | (3108) |
| | 10/10/97 | Lender Closing Instructions Sent to ATS | (2815-2819) |
| | 11/19/97 | Closing/HUD-1 | (2730-2731) |
| Moise Gx 10 | 12/18/97 | HUD Direct Endorsement Approval** | (3630) |
| | 12/18/97 | Lender Closing Instructions Sent to ATS | (3301-3302) |
| | 12/19/97 | Closing/HUD-1 | (3332-3333) |
| Ortiz Gx 11 | 6/3/97 | HUD Direct Endorsement Approval** | (1667) |
| | 6/6/97 | Lender Closing Instructions Sent to ATS | (3900-3901)+(3915-3916) |
| | 6/6/97 | Closing/HUD-1 | (3663-3664) |
| Rodriguez Gx 12 | 10/15/97 | HUD Direct Endorsement Approval** | (4583) |
| | 10/16/97 | Lender Closing Instructions Sent to ATS | (4340+4385+4400-4401) |
| | 10/17/97 | Closing/HUD-1 | (4406-4407) |
| Urueioma Gx 13 | 9/10/97 | HUD Direct Endorsement Approval | (4998) |
| | 9/11/97 | Lender Closing Instructions Sent to ATS (received 9/12/97) | (4723-4734) |
| | 9/12/97 | Closing/HUD-1 | (4613-4614) |

*Writer's error: should be 5/19/97 *see* (002 3 3)

** Title Commitment faxed to PAMI same day or before Direct Endorsement Approval date executed by Corinthian

Ex. A

**Ex. B**

U.S.A. v. HOLLANDER
Case No. 00-6168

## PRICE/VALUE SUMMARY

| Buyer | Gx # | Sales Price | Appraised Value | Mortgage | HUD-1 Date | ARC Price |
|---|---|---|---|---|---|---|
| Alabre, Jean | 14 | $86,500 | $86,500 | $86,452 | 7/23/97 | $76,000 |
| Benoit, Katherine | 15 | $87,000 | $88,000 | $86,912 | 8/28/97 | $75,000 |
| Betye, Luminitza M. | 3 | $115,000 | $115,000 | $114,877 | 5/22/97 | $101,000 |
| Carswell, Janice | 4 | $78,000 | $79,000 | $77,960 | 11/24/97 | $65,000 |
| Denis, Gilbert & Chantal | 16 | $87,000 | $90,000 | $86,912 | 8/26/97 | $75,000 |
| Derosier, Titi & Gelene | 17 | $91,500 | $91,500 | $79,141 | 6/20/97 | $81,500 |
| Devalon, Joel & Veyonne | 18 | $80,000 | $80,000 | $78,937 | 6/26/97 | $67,000 |
| Dimanche, Jean Claude & Marie | 5 | $79,000 | $79,000 | $76,943 | 9/29/97 | $69,000 |
| Doreus, Rosalie | 19 | $77,000 | $77,000 | $80,458 | 1/7/98 | $62,000 |
| Ducatel, Joseph & Ann-Marie | 6 | $80,500 | $82,000 | $88,954 | 12/8/97 | $68,000 |
| Ellis, Marsha | 20 | $89,000 | $89,000 | $73,926 | 9/25/97 | $75,900 |
| Francois, Marie G. | 7 | $74,000 | $75,000 | $92,434 | 8/15/97 | $62,000 |
| Garcia, Steven | 21 | $92,500 | $93,000 | $82,100 | 9/6/97 | $80,000 |
| Garrepy, Nitza C. | 22 | $84,000 | $84,000 | $81,953 | 9/11/97 | $72,000 |
| Georges, Anibal | 8 | $82,000 | $84,000 | $81,595 | 6/27/97 | $70,000 |
| Gray, Kenneth | 23 | $81,000 | $87,000 | $54,959 | 10/6/97 | $69,000 |
| Jaboin, Raphael & Astrona | 24 | $55,000 | $56,000 | $90,746 | 9/19/97 | $45,000 |
| Jackson, Michelle | 25 | $90,000 | $91,000 | $77,000 | 6/9/97 | $77,500 |
| Johnson, Leroy | 26 | $77,000 | | $82,458 | 1/9/98 | $69,000 |
| Lindor, Jean & Guilene | 27 | $82,500 | $96,000 | $113,942 | 11/20/97 | $70,000 |
| Lindor, Joscheba & MisLvne Delva | 28 | $114,000 | $121,000 | $89,928 | 7/14/97 | $97,500 |

Ex. B

U.S.A. v. HOLLANDER
Case No. 00-6168

## PRICE/VALUE SUMMARY

| Buyer | Gx # | Sales Price | Appraised Value | Mortgage | HUD-1 Date | ARC Price |
|---|---|---|---|---|---|---|
| Litherland, Lenworth | 29 | $90,000 | $90,000 | $89,245 | 6/25/97 | $78,000 |
| Mazard, Marie | 30 | $90,000 | $90,000 | $98,415 | 10/13/97 | $78,000 |
| Mike, Otha & Willie Mae | 9 | $98,500 | $99,000 | $91,453 | 12/19/97 | $80,000 |
| 1oise, Liguet & Eunide | 10 | $91,500 | $93,000 | $83,947 | 6/16/97 | $78,000 |
| Ortiz, Luz | 11 | $84,000 | $84,000 | $88,446 | 7/18/97 | $72,000 |
| Palma, Medardo & Rodriguez Soccoro | 31 | $88,500 | $89,000 | $88,150 | 7/18/97 | $76,000 |
| Pena, Anibal & Minerva | 32 | $115,500 | $116,000 | $115,593 | 7/18/97 | $101,000 |
| Pickney, David | 33 | $89,000 | $89,000 | $88,954 | 1/7/98 | $72,000 |
| Prince, Marie C. | 34 | $115,500 | $120,000 | $115,441 | 12/19/97 | $99,900 |
| Rivera, Victor | 35 | $104,000 | $104,000 | $103,937 | 8/25/97 | $90,000 |
| Rodriguez, Emerita | 12 | $65,000 | $65,000 | $64,928 | 10/17/97 | $52,000 |
| Roserne, Mistedel | 36 | $82,500 | $85,000 | $82,458 | 5/18/98 | $70,000 |
| Saltz, John W. | 37 | $109,000 | $110,000 | $109,560 | 10/23/97 | $94,000 |
| Sobalvarro, Juan J. Jarquin | 38 | $93,000 | $97,000 | $92,952 | 11/26/97 | $79,000 |
| Telfort, Guy | 39 | $100,000 | $100,000 | $99,949 | 12/12/97 |  |
| Thomas, Aspinell | 40 | $95,000 | $95,000 | $94,950 | 1/6/98 | $82,500 |
| Thomas, Wallace | 41 | $80,000 | $80,000 | $79,959 | 8/11/97 | $65,000 |
| Uruejoma , Caroline I. | 13 | $85,000 | $85,000 | $84,918 | 9/12/97 | $70,000 |
| Vaughn, Mitchell C. | 42 | $115,700 | $120,000 | $115,593 | 7/25/97 | $100,500 |
| Williams, Rupert & Martinez, Ninette | 43 | $94,500 | $95,000 | $94,452 | 11/19/97 | $80,500 |