UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6168-CR-FERGUSON

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| BRUCE HOLLANDER | ) |

NIGHT BOX
FILED

FEB 19 2002

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT(PSI)

The United States of America, by and through its undersigned counsel, hereby files this Opposition to Defendant's Objections To the PSI, as legally and factually baseless, and states as follows:

1. In September 2001 the defendant was charged in a thirteen count superseding indictment with one count of conspiracy to commit mail and wire fraud and submitting false statements to a lender in order to obtain a loan insured by HUD, five counts of wire fraud, six counts of submitting false statements to a lender in order to obtain a loan insured by HUD, and one count of money laundering. In November 2001 this matter was tried over a seven day period, and the jury returned a verdict of guilty as to each count of the indictment.

2. The evidence adduced at trial showed that in late 1996 Mark Cohen went into partnership with Eric Silverman. They would solicit unsophisticated, first time home buyers to purchase homes.

1

They would show the buyers various homes. When the buyers were ready to purchase a home, Cohen and Silverman, through Silverman's company, American Redevelopment Corporation (ARC), would enter into a contract to buy the house and then enter into a second contract to sell the house to the first-time home buyer for approximately $15,000 more than ARC purchased it. The closing for both of the sales would take place on the same date. These type of transactions are known as "flip" transactions, where an investor buys property and immediately "flips" or sells the property for an immediate profit. Many lending institutions do not like to fund "flip" transactions. In order to lawfully execute a "flip" transaction the lending institution must be apprized of both the purchase and the immediate resale. The defendant conspired with Cohen and Silverman to defraud Corinthian Mortgage Company, HUD and other lending institutions by providing false title commitments that knowingly hid the initial purchase of the properties. These title commitments were false in that they would state that Silverman's company, American Redevelopment Corporation (ARC), owned the property, instead of the actual seller. The title commitment would also fail to list an effective date and fail to list on its Schedule B that one of the steps that needed to be taken to clear title was that a deed needed to be issued from the actual seller to ARC. The defendant would sign these erroneous title commitment forms and they would be faxed to the mortgage

broker who would then fax the erroneous title commitment to the ultimate lender.

3. Co-defendant's Cohen and Silverman both testified that prior to their first transaction with the defendant there was a telephone conference between the mortgage broker, Roni Oz, and the defendant with both Cohen and Silverman present at the defendant's law office. Oz told the defendant that his lender would not lend if the title commitment reflected the true owner. Cohen and Silverman both testified that the defendant agreed to falsely prepare the title commitments for Cohen and Silverman, but that he would omit the effective date. Two of defendant's employees, Terry Ellis and Lybea McGhie, also testified that they were told by the defendant to falsely prepare the title commitments or else the lenders would not make the loans.

4. Cohen, Silverman, and McGhie also testified that the defendant executed and caused to be executed at the closings false HUD-1 settlement statements and HUD-1 addendums. These false statements involved the reimbursement of gift funds by the defendant to Silverman. A HUD insured loan for the purchase of a person's primary residence requires that a minimum cash investment be made by the borrower from his or her own funds of at least 3% of the purchase price to be used for closing costs and the down payment. HUD requires the minimum cash investment in order to ensure that the borrower has an actual financial stake in the

property, and will be more likely to maintain the mortgage commitment and less likely to fall into default. If the borrower did not have the funds personally, those funds could be provided to the borrower by certain persons and entities as a gift. However, the seller was not permitted to provide the funds to the borrower. The testimony at trial was that by September 1997 the defendant became aware that Silverman would unlawfully provide the funds to the buyer. Silverman, Cohen, and McGhie all testified that in September 1997 there were a number of closings on the same or successive days. Silverman needed funds for the gift checks, so McGhie directed Silverman to see the defendant. The defendant then directed McGhie to issue a check to Silverman in the amount of the gift funds, so that Silverman could go to the bank, cash the check and return with the gift funds. Even though the defendant was aware that Silverman was paying the gift funds, the evidence at trial was that the defendant executed the HUD-1 settlement statements falsely reflecting that gifts were coming from the buyers and HUD-1 addendums falsely stating that the buyers were not being reimbursed by the seller for the gift funds.

5. The advancing of the gift funds on certain loans by the defendant to Silverman and the reimbursement of the gift funds by the defendant to Silverman on the other loans was an essential part of the scheme as these funds were needed to further fuel the scheme. The advancing of the gift funds on certain loans by the

defendant to Silverman and the reimbursement of the gift funds by the defendant to Silverman on the other loans formed the essence of the money laundering charge of which the defendant was convicted in Count 13.

6. In all from May 1997 through May 1998 the defendant executed 41 false title commitments for Cohen and Silverman and numerous false HUD-1's and HUD-1 addendums. At trial a defense witness, Geri Hunt, testified that in mid-1997 the defendant also falsely prepared title commitments involving "flip" transactions for Wesley Grant and Richard King. The title commitments did not reflect the true owner, failed to list an effective date and failed to list on its Schedule B that one of the steps that needed to be taken to clear title was that a deed needed to be issued from the actual seller.

7. After May 1998 the defendant continued as an active participant of the conspiracy. In mid-1998 auditors from HUD began to audit the mortgage broker, PAMI. The HUD auditors contacted Silverman for an interview. Silverman met with the defendant. Silverman testified that the defendant told him to "stonewall" the HUD auditors and not admit that he was aware of any fraud. Silverman then met with the HUD auditors and responded to the HUD auditors as he was advised by the defendant. One of the HUD auditors, Eileen Tam testified that the defendant "stonewalled" and did not provide documents requested by her for five months and

never explained how to balance his own title summaries. The information the defendant withheld would have allowed the HUD auditors to determine that the transactions were illegal "flip" transactions.

8. After the defendant was convicted the PSI was prepared reflecting that the defendant's offense level was determined to be level 24 and the criminal history was a category I. Thus, the defendant's sentencing guideline range is 51-63 months. The guideline range was computed utilizing the most recent guideline book in effect for the year of the offense. The current guideline book incorporates the recent changes to the fraud and money laundering guidelines. The offense level was computed as follows:

| | |
|---|---|
| Base level for offense under 2B1.1 for fraud loss of $400,000 or greater | 20 |
| Plus: Adjustment under 2S1.1 due to conviction on money laundering charge | 2 |
| Plus: Adjustment for abuse of trust | <u>2</u> |
| Total | 24 |

9. The defendant has filed eleven pages of objections to the PSI and has filed four pages of supplemental objections to the PSI. The first five pages of the defendant's objections to the PSI merely contest the description of the offense conduct of the defendant and his co-conspirators and does not contest the guideline calculation. The Court can note the defendant's

objections to the description of the offense conduct and then attach the defendant's version to the PSI. There is no need to conduct a hearing on those objections. The defendant has filed the following objections, which do effect the guideline calculation:

    A.    The defendant claims that the guideline calculation should be made under the guideline book in effect when the offense was committed, not the current book, utilizing the fraud guideline, not the money laundering guideline.

    B.    The defendant claims that if the current guideline book is used he should not receive a two point enhancement for the money laundering conviction.

    C.    The defendant claims that the fraud loss is less than $70,000, not over $400,000.

    D.    The defendant claims that he is entitled to two points for acceptance of responsibility.

    E.    The defendant claims he should get an two point reduction for a minor role.

    F.    The defendant objects to the amount of restitution.

### The Money Laundering Guideline Was Properly Utilized

10.    The defendant claims that the guideline book for the year of the offense should be used without considering the conviction for money laundering. The defendant claims on page 1 of

his supplemental objections that the conduct of the defendant falls outside the "heartland" of typical money laundering cases and that the defendant should be sentenced under the fraud guidelines. Unfortunately for the defendant the Eleventh Circuit previously decided this issue against the defendant. In United States v. Adams, 74 F3d 1093 (11th Cir. 1996) the district decided to sentence a defendant under the fraud guidelines, instead of the money laundering guidelines, in spite of the defendant's conviction for money laundering. The district court felt that the fraud guideline was more appropriate for a routine fraud case. The Eleventh Circuit reversed. The Eleventh Circuit held that the primary justification used by the district court to lower the base offense levels is contrary to the law. Since the jury found the defendants guilty of violating the money laundering statute, the money laundering convictions must be included in the sentence, and U.S.S.G. § 2S1.1 must be applied. The district court cannot simply ignore the fact that the defendants were convicted of violating the money laundering statute. See 18 U.S.C. § 3551.

11. In United States v. De La Mata, 266 F3d 1275, 1302 (11th Cir. 2000), the defendant requested the Eleventh Circuit to reconsider its decision in Adams citing the Third Circuit's decision in United States v. Smith, 186 F3d 290 (3rd Cir. 1999) which held that a sentencing court should consider whether the designated guideline applies or whether conduct is "atypical" in

comparison to that usually punished by the statute of conviction, and if so decides which guideline is more appropriate. The Eleventh Circuit in De La Mata held that they rejected that approach in Adams. The defendant cites as his authority United States v. Renick, 273 F3d 1009 (11th Cir. 2001). In Renick the Eleventh Circuit did not decide this issue. Instead, the Court merely noted that the district court had decided that the more appropriate guideline was the fraud guideline, not the money laundering guideline, and that neither party had appealed the district court's decision. Renick does not discuss or decide this issue, and the authority in Adams and De La Mata is still controlling. Thus, the Eleventh Circuit case law requires the money laundering guideline to be used, and defendant's objection must be denied.

### The Two Point Money Laundering Adjustment is Mandatory

12.     Since the law money laundering guideline is required to be utilized under the guideline book in effect for the year of the offense the defendant's guideline calculation would be a level 26, based on a level 24 under level 2S1.1 plus two points for abuse of trust/special skill. However, the sentencing guidelines for money laundering have changed as of November 1, 2001. These changes were in part in response to the disparate treatment of money laundering defendants in the different circuits as

evidenced in the <u>Smith</u> and <u>De La Mata</u> decisions. If the defendant decides to utilize the most recent guideline book, the defendant will be sentenced under Section 2S1.1, which states that the base offense level should be the offense level for the underlying offense from which the laundered funds were derived. See 2S1.1(a)(1). Thus, in this case the base offense level is determined under the fraud guidelines. However, Guideline Section 2S1.1(b)(2)(b) states that if the defendant was convicted under 18 USC Section 1956 there is an additional two level increase. The defendant objects to this two level increase, which is mandatory. The defendant does not state any basis other than he believes the two level enhancement is inappropriate. The adjustment is mandatory if the defendant wants to utilize the current guideline book. Thus, this objection must be denied as baseless.

### The Amount of Loss Is More Than $400,000

13. Since the current money laundering guidelines require the court to determine the base level from the underlying offense, the defendant's base level must be determined from the fraud guidelines. Under the Sentencing Guidelines the base level for the twelve counts of fraud are grouped together and the base level is determined based on the amount of loss. The fraud guidelines in the current guideline book are set forth in Section 2B1.1 with a base offense level of six and a 14 point enhancement

for a loss of $400,000 or more. The defendant's relevant conduct includes all acts that occurred during the commission of the offense, in preparation for that offense, and in the course of attempting to avoid detection or responsibility for that offense. See Guideline Section 1B1.3(a)(1). These acts could include conduct that was not charged in the indictment. See <u>United States</u> v. <u>Ignancio Munio</u>, 909 F2d 436 (11th Cir. 1996). These acts also include conduct that were part of the same course of conduct or common scheme or plan. See Guideline Section 1B1.3(a)(2). Footnote 9 to Guideline Section 1B1.3 states that the same course of conduct includes offenses that have the same <u>modus operandi</u> as the offense of conviction and those that have a degree of similarity to the offense of conviction and are near in time to the offense of conviction. Further, as noted in <u>United States v. Behr</u>, 93 F2d 764 (11th Cir. 1996), the Eleventh Circuit broadly interprets the provisions of the relevant conduct Guidelines.

14.     Application Note 8(b) to the Sentencing Guidelines (eff Nov. 1, 2000) states that in fraudulent loan application cases the loss is the actual loss to the victim or the expected loss if the loss has not yet come about. However, where the intended loss is greater, then the intended loss is to be used. The loss need not be determined with precision. The court may make a reasonable estimate of the loss. See Application Note 9.

11

15.     In this case the loss has been determined using both the actual and expected loss, which in this case are greater than the intended loss.  In computing the loss the government did not include losses on properties that closed prior to the defendant entering the conspiracy in May 1997.  In this case HUD is the guarantor of almost all of the loans.  When a borrower has defaulted HUD pays the lender the unpaid balance on the loan. HUD then resells the property.  With respect to the 41 properties that the defendant closed for Silverman and Cohen, six have been reacquired by HUD, of which five have already been resold.[1]  The loss set forth in the attached chart for the properties that have been resold is simply the cost paid to reacquire the properties less the amount recovered from the resale.  Although there were expenses associated with the resale of the property, those expenses were not included.  Also included was the loss on a property that has been foreclosed upon that was one of the 41 properties closed  by the defendant, but the property had not been guaranteed by HUD. The property was financed through First Bankers Mortgage Services, which is one of the lenders listed in

---

[1] The defendant notes in his supplemental objections that the national foreclosure rate is 6.4%, and the foreclosure rate in this case was also 6.4%.  While this information is totally irrelevant, it must be noted that on the 41 properties that the defendant closed, six have already been foreclosed upon and another one has been repurchased by HUD.  Thus, the foreclosure rate on the properties the defendant closed is approximately 17%, not including the property that there is currently a lis pendens on.  Thus, the foreclosure rate on the properties the defendant closed is almost three times his purported national average.

paragraph 7 of the indictment. The defendant issued a fraudulent title commitment on the property in the same manner as on the other properties. This loss has been included as an actual loss from the offense of conviction. Also included with respect to the original 41 properties was one property that HUD repurchased from a lender and another property that currently has a <u>lis pendens</u> from the lender. A <u>lis pendens</u> is generally filed by the lender when the payments due are several months in arrears. Including this property is appropriate as the sentencing guidelines provides in the case of mortgage application fraud to include expected loss. The losses on the properties not yet sold are determined by taking an average of the losses on the properties that already have been sold.

16.    The loss computations also include the actual losses from the foreclosures on four properties, which the defendant closed for Wesley Grant and Richard King. Each of the losses are "flip" transactions, for which the defendant was the closing agent. For each of these transactions for Grant and King the defendant executed a fraudulent title commitment, which hid the "flip" transaction in the same manner he hid the "flip" transaction for Cohen and Silverman. The four transactions for King and Grant took place from June 1997 through October 1997 at the same time the defendant was closing on Cohen and Silverman's transactions. These transactions are properly included as

13

relevant conduct as it is part of the same course of conduct as the defendant executed the same fraudulent documents in order that the sellers could obtain loans on the same type of (flip) transactions.

17.    In this case the defendant did not withdraw from the conspiracy after his last closing for them in May 1998.[2] Instead, the defendant continued to advise Cohen and Silverman. The testimony of Silverman, which was supported by the tape recording played at trial, is that in July 1998 the defendant advised Silverman to "stonewall" the HUD auditors. This included advising Silverman to lie about Silverman's knowledge of any false documents submitted to the lenders. This "stonewalling" was further supported by the testimony of HUD auditor Eileen Tam who said it took five months for the defendant to turn over certain documents that she requested. Those documents would have made it clear that the transactions were "flip" transactions. Thus, the defendant is responsible for all transactions while he continued in the conspiracy, especially since the helped

---

[2] Once a conspiracy is established involving a defendant it is considered to continue unless and until the defendant proves by showing affirmative acts, that the conspiracy was terminated or that he withdrew from it. US v. Roper, 874 F.2d 782, 787 (11th Cir. 1989). The burden is on the defendant to prove that he has withdrawn from the conspiracy. United States v Wentland, 582 F.2d 1022, 1025 - 26 (5th Cir. 1978), cert. denied, 440 U.S. 976 (1979). Once having joined a conspiracy and not having withdrawn, the conspirator cannot insulate himself from the acts of his coconspirators. US V. Bobo, 586 F.2d 355, 370 n.20 (5th Cir. 1978), cert. denied, 440 U.S. 976 (1979).

perpetuate the conspiracy. Thus, the defendant is responsible for the losses on all the closings of Cohen and Silverman through late 1998. The losses from these transactions are set forth on the attached sheet and include properties sold by HUD, properties reacquired by HUD awaiting foreclosure, and those with a <u>lis pendens</u> filed by the lender.

18.    Thus, the total actual and expected loss of $798,669 is proper. In any case the loss is greater than $400,000 as the intended loss is at least $600,000. In this case the defendant intended to hide the "flip" transaction by executing false title commitments. The intended loss is the amount of the "flip," which is approximately $15,000 per transaction times 41 transactions or $615,000.

## The Defendant is Not Entitled to Acceptance of Responsibility

19.    The defendant claims he is entitled to a two point reduction for acceptance of responsibility. Application Note 2 to Section 3E1.1 of the Sentencing Guidelines states that "the adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted and then admits guilt and expresses remorse." The application goes on to state that in rare situations a defendant may clearly demonstrate acceptance even though he goes to trial. That situation can

occur if the defendant goes to trial to preserve a legal issue, such as a constitutional challenge. However, a determination that a defendant has accepted responsibility will be based **"primarily upon pre-trial statements and conduct."**

20.     The defendant has not even made a statement accepting responsibility, but even if he does there is no legal basis to entitled him to the two point reduction for acceptance of responsibility. In this case there were no constitutional or other legal issues that needed to be preserved by the defendant. Instead, the defendant put the government to its burden of proof at trial by denying the essential factual elements of guilt. A large part of the defendant's defense was that the government witnesses, Cohen, Silverman, Terry Ellis, and Lybea McGhie were all liars and that the defendant did not have actual knowledge of the fraudulent scheme. The defendant reiterates that theme in his objections to paragraph 15 of the PSI, wherein he states that he disputes Cohen's and Silverman's testimony that he had actual knowledge of the gift funds scheme. In order for a defendant to receive acceptance of responsibility he must truthfully admit and not falsely deny all relevant conduct. Further, there was nothing in the defendant's pre-trial conduct that even remotely suggested that he was accepting responsibility. Thus, this objection must be denied.

## The Defendant Is Not Entitled to a Minor Role

21.     The defendant claims that he is entitled to a two point reduction for a minor role. The defendant has the burden of proving that his sentence should be reduced to reflect his minor role in the offense. United States v. Rodriguez De Varon, 175 F3d 930 (11th Cir. 1999). In Rodriguez De Varon the court noted that in making this decision the district court must first consider the defendant's role in the relevant conduct for which he was held accountable at sentencing, and, second, his role as compared to other participants. If anything the defendant should have gotten an enhancement for his role. The defendant directed at least two of his employees, Terry Ellis and Lybea McGhie, to falsely prepare title commitments for Cohen and Silverman. He also directed McGhie to issue reimbursements of gift checks and to advance gift funds so that Silverman could buy gift checks. After the defendant lost his underwriter he utilized another attorney named Javits to close on a loan for Cohen and Silverman. The loan contained a fraudulent title commitment, which McGhie testified she prepared at the direction of the defendant.

22.     Further, the defendant's role was essential to the fraudulent scheme. Simply put it was critical to the scheme that Cohen and Silverman find a title agent who would falsely prepare the title commitments and allow the reimbursement of the gift

funds. As the defendant's own expert Mr. Mills testifed that when he fully discloses the "flip" transaction, the deal generally falls through. The defendant's basis for requesting this reduction is that he participated in far fewer transactions than the others. However, he was not held accountable for the transactions that occurred prior to his joining the conspiracy, and was not held responsible for transactions occurring after late 1998. Thus, the defendant was held accountable for less transactions than the other defendants. He was held responsible only for the transactions he closed and for the transactions that were closed while the defendant was advising Silverman to "stonewall" the HUD auditors and the defendant himself was "stonewalling" the HUD auditors. As the defendant had an important role in the relevant conduct that he has been held accountable for and his role was important as compared to the other coconspirators, the defendant is not entitled to a reduction for a minor role.

### The Amount of Restitution Has Been Properly Computed

23.     The defendant lastly complains that the amount of restitution is not correct. The amended PSI reflects that the amount of restitution that the defendant owes is $271,045. This amount represents the loss on the nine properties listed in the attached chart that have already been resold. As noted above, they

represent six properties that the defendant closed for Cohen and Silverman that have already been resold, and three additional properties that were foreclosed upon, which transactions occurred while the defendant was still a participant in the conspiracy. 18 USC Section 3663A makes restitution mandatory for this offense. Thus, the defendant's objection must be denied.

## CONCLUSION

For the foregoing reasons each of the defendant's objections to the PSI must be denied and the defendant must be sentenced to a sentence within the guideline range of 51-63 months.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____
JEFFREY N. KAPLAN
Assistant United States Attorney
FLA BAR No. A005500030
500 E. Broward Blvd., Suite 700
Fort Lauderdale, Florida 33394
Tel: (954) 356-7255x3515
Fax: (954) 356-7336

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered by United States mail, this 10+h day of February, 2002, to: Joel Hirschhorn, Esq., Douglas Center, Penthouse One, 2600 Douglas Road, Coral Gables, Florida 33134.

_____
JEFFREY N. KAPLAN
Assistant United States Attorney