UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6168-CR-FERGUSON

UNITED STATES OF AMERICA   )
                           )
v.                         )
                           )
BRUCE HOLLANDER            )
_____)

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL**

The United States of America, by and through its undersigned counsel, hereby files this opposition to Defendant's Motion for Judgment of Acquittal and in the Alternative for a New Trial, and states as follows:

1.  In September 2001 the defendant was charged in a thirteen count superseding indictment with one count of conspiracy to commit mail and wire fraud and submitting false statements to a lender in order to obtain a loan insured by HUD, five counts of wire fraud, six counts of submitting false statements to a lender in order to obtain a loan insured by HUD, and one count of money laundering. On November 20, 2001, a jury returned a verdict of guilty as to each of the thirteen counts of the indictment.

2.  In January 2002 the defendant filed a Motion for Judgment of Acquittal and in the Alternative for a New Trial. The arguments raised by the defendant in his Motion for Judgment of

1

Acquittal are as follows:

 A. Neither HUD nor the lenders relied on the title commitments issued by the defendant and the title commitments were not material to their decisions.

 B. The jury failed to rationally consider the evidence concerning the gift checks.

 C. The defendant failed to introduce any evidence that HUD in fact issued its insurance certificates.

 D. There was not proof of wire transfers for the wire fraud counts, and the wiring was not based on any material documents submitted to Corinthian.

 E. That the decision of the Eleventh Circuit in <u>United States</u> v. <u>DeCastro</u>, 113 F3d 176 (11th Cir. 1997) was improperly decided, and the false statements made for the purpose of influencing HUD were not material.

 F. That the misrepresentations made in the title commitment policies by the defendant were implied false statements that are not actionable under the decision in <u>Thorn</u> v. <u>United States</u>, 17 F3d 325 (11th Cir. 1994).

3. <u>Standard of Review</u>.

In deciding a motion for judgment of acquittal based upon allegedly insufficient evidence, the Court must review the evidence in the light most favorable to the government, drawing all reasonable inferences and credibility choices made in favor of the

jury's verdict. <u>United States v. Gilbert</u>, 47 F.3d 1116, 1118 (11th Cir. 1995). If a reasonable jury could have concluded beyond a reasonable doubt that defendants were guilty of the offense, the jury's verdict must stand. <u>United States v. Toler</u>, 144 F.3d 1423, 1428 (11th Cir. 1998).

    4.   <u>The Evidence In The Light Most Favorable To The Government</u>.

Two of the witnesses at trial were the defendant's former employees, Terry Ellis and Lybea McGhie. Ellis had worked for the defendant for approximately two years ending in August 1997. About two months before she left the defendant started doing business with Cohen and Silverman. Ellis testified that she was told by the defendant to falsely prepare the title commitments or else the lenders would not make the loans. These title commitments were false in that they would state that Silverman's company, American Redevelopment Corporation (ARC), owned the property, instead of the actual seller. The title commitment would also fail to list an effective date and fail to list on its Schedule B that one of the steps that needed to be taken to clear title was that a deed needed to be issued from the actual seller to ARC. Ellis testified that the defendant would closely review the title commitments, and then the defendant would sign the erroneous title commitment forms. The title commitments would be faxed to the mortgage broker who would then fax the erroneous title commitment to the ultimate lender.

3

5. Lybea McGhie started working for the defendant around the same time that Cohen and Silverman began doing closings with the defendant. Mcghie testified that she was told by the defendant to falsely prepare the title commitments or else the lenders would not make the loans. These title commitments were false in that they would state that Silverman's company, American Redevelopment Corporation (ARC), owned the property, instead of the actual seller. The title commitment would also fail to list an effective date and fail to list on its Schedule B that one of the steps that needed to be taken to clear title was that a deed needed to be issued from the actual seller to ARC. McGhie testified that the defendant would closely review the title commitments, and then the defendant would sign the erroneous title commitment forms. The title commitments would be faxed to the mortgage broker who would then fax the erroneous title commitment to the ultimate lender.

6. McGhie also testified that the defendant executed and caused to be executed at the closings false HUD-1 settlement statements and HUD-1 addendums. These false statements involved the payment of the gift funds by Silverman and the reimbursement of gift funds by the defendant to Silverman. The testimony of McGhie at trial was that Silverman told her on a number of occasions that he did not have the money for the gift funds. McGhie testified that she would tell Silverman "to go see Bruce." After Silverman would talk to the defendant McGhie stated that the defendant would

4

tell her to make a check out to Silverman for the amount of the gift funds. The defendant would then sign the check and Silverman would come back later with the gift funds. McGhie testified that the HUD-1 addendums, which the defendant signed and caused her to sign were false in that the defendant knew that Silverman was paying the gift funds. McGhie testified that the HUD-1 statements were also false, because on many occasions Silverman would not have the gift check until after the closing.

7. Co-defendant's Cohen and Silverman both testified that prior to their first transaction with the defendant there was a telephone conference between the mortgage broker, Roni Oz, and the defendant with both Cohen and Silverman present at the defendant's law office. Oz told the defendant that his lender would not lend if the title commitment reflected the true owner. Cohen and Silverman both testified that the defendant agreed to falsely prepare the title commitments for Cohen and Silverman, but that he would omit the effective date.

8. Cohen and Silverman also testified that the defendant executed and caused to be executed at the closings false HUD-1 settlement statements and HUD-1 addendums. Their testimony at trial was that by September 1997 the defendant became aware that Silverman would unlawfully provide the funds to the buyer. Cohen and Silverman both testified that in September 1997 there were a number of closings on the same or successive days. Silverman

needed funds for the gift checks, so Silverman and Cohen would talk to the defendant. The defendant would agree to advance the gift funds. Cohen and Silverman both testified that if the defendant did not know that Silverman was providing the gift funds prior to September 1997, that he certainly knew by mid-September 1997. Silverman also testified that he would alter the gift checks in order that the lender would not get suspicious. Silverman testified that the defendant was aware that he was altering the gift checks, because the defendant saw him using the copying machine to alter a gift check and then the defendant told Silverman to do that somewhere else.

9. Debbie Davidson also testified. Ms. Davidson had been employed for many years for Corinthian Mortgage Company in many different capacities, including being in charge of the closing department and the quality control department. She testified that if Corinthian had become aware that the transactions were "flip" transactions it certainly would have influenced Corinthian's decision to lend. At a minimum the loan would have been sent to the underwriting department in order for that department to determine if the price spread could be justified. Ms. Davidson also testified that the funding is either sent through a check by an overnight delivery service or by wire transfer if the money is needed to be sent for a closing on the next day. Ms. Davidson introduced Government's Exhibit 45, which contained wire

transmittal forms reflecting the wire transfer with respect to Counts 4 through 6. She also introduced Government's Exhibit 44, which is the file of Moise Leguet. The file contained a facsimile to Corinthian from the defendant's title company of the HUD-1.

10.　Eileen Tam, an auditor from HUD, testified and introduced Government's Exhibits 203 through 243, which represented the HUD files for the transactions closed by the defendant. Ms. Tam testified that on the front of each file is a stamp reflecting that the loan had been offered and accepted by HUD for insurance.

11.　Based on the evidence at trial it is clear how the jury found beyond a reasonable doubt that the defendant was guilty of each of the offenses charged. The defendant's motion fails to cite any of the case law pertaining to the applicable statutes as the case law is unfavorable to the defendant.

**Reliance is Not an Element of Any of the Charged Offenses**

12.　Defendant's first argument is that the lenders and HUD did not rely on the title commitments provided to them. However, reliance is not an element of any of the offenses charged in the indictment. The crime of making false statements to HUD is one of subjective knowledge and intent and requires no defrauding of HUD or reliance on the part of its officials. US v. Henninger, 350 F.2d 849, 850 (10th Cir. 1965). It is not necessary to show that reliance of the victim was induced by the misrepresentations of the defendant, nor is it necessary to show that the victim was misled

in order to support a conviction of mail fraud. <u>United States v. Goldberg</u>, 455 F. 2d 479 (9th Cir. 1972). Thus, it is irrelevant whether the lender relied upon the defendant's misrepresentations. The defendant also makes the claim that the loans are approved by the lender and HUD before the title commitment is even forwarded. As Ms. Davidson testified, even though a lender may give a preliminary approval to go forward with a loan, if fraud is found, the loan will become unapproved. She stated that the approval is not final until the loan has been funded. Even the defendant's expert Mr. Mills testified on cross-examination about loans that were approved and subsequently became unapproved due to the lender becoming aware of the transaction involving fraud.

### The Misrepresentations Made By Defendant Were Material

13.  The defendant claims that the misrepresentations made by him were not material. However, the defendant does not even define the term material. In <u>Neder v. US</u>, 119 S.Ct. 1827 (1999) the Supreme Court defined materiality as a false statement that has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." In this case the evidence at trial showed that the false statements on the title commitments clearly were capable of influencing the lender. As Debbie Davidson testified if Corinthian would have known that these transactions were "flips" at the very least the loans would have been sent back to the underwriting department to

determine if the price spread was justified. Ms. Davidson also said that if Corinthian was aware that the seller was paying the gift funds that Corinthian would definitely not have made the loan. Even more compelling is the testimony of both Terry Ellis and Lybea McGhie who testified that the **defendant** told them that the lender would not make the loans if the title commitments were done properly. Certainly, the defendant, who was a very experienced real estate attorney, knew that if the lender was aware that the transaction was a "flip" then the lender would not lend and he conveyed that to both Ellis and McGhie. To put it another way why would the defendant falsely prepare 41 title commitments if correctly preparing them would lead to the same result. The only logical conclusion is that the defendant knew that by preparing the title commitments properly the lender would not lend on the transaction. Certainly the jury had more than sufficient testimony and other evidence to conclude that false statements made by the defendant and his coconspirators were material.

**The Evidence With Respect to the Gift Checks Was Sufficient to Support the Verdict**

14.   As noted above, McGhie, Silverman, and Cohen all testified at trial as to the defendant's knowledge of the gift check scheme. Cohen and Silverman both stated that while the defendant may have not known initially about the scheme, by

9

September 1997 the defendant definitely knew when Silverman needed an advance of the proceeds in order to obtain the gift funds. McGhie, Silverman, and Cohen all testified that when Silverman did not have sufficient money for the gift funds Cohen and Silverman had conversations with the defendant. While McGhie generally prepared these checks, all but one of the gift fund advance and reimbursement checks were signed by the defendant. (See Government's Ex. 46). The defendant claims that the $7,000 check issued to Silverman did not go as an advance of the loan for Josheba Lindor. However, in Government's Ex. 47 presented at trial the government showed the deposit slip showing the $7,000 deposit into Jean Lindor's account to purchase the gift check. Silverman testified that he gave Lindor the $7,000 proceeds from the advance check the defendant issued him and that Lindor wrote a check for $6,800 and retained $200 for his fee. Thus, there was more than sufficeint evidence to conclude that the defendant had knowledge and participated in the gift check scheme.

**The Defendant's Arguments As To the HUD insurance Certificates Are Baseless**

15.     The defendant claims that the government did not introduce evidence of the HUD insurance certificates and therefore Counts 7-12 must be dismissed. The defendant's argument is baseless. Whether or not HUD actually issued

mortgage insurance is not an element of 18 USC Section 1010. See <u>United States</u> v. <u>Jenkins</u>, 785 F2d 1387 (9th Cir. 1986). The offense is whether the defendant made a false statement for the purpose of obtaining a loan that will be offered to or accepted by HUD for insurance. Thus, there is no need to provide proof at trial that the lender actually obtained government insurance. However, the government did introduce evidence that each of the HUD loans were being offered to and accepted by HUD for insurance. The government introduced Exhibits 203 through 243, which are the HUD case binders. HUD auditor Eileen Tam showed to the jury the stamp on the front of the HUD case binder that represents that the loans were offered to and accepted by HUD for insurance. The defendant's argument is wholly without merit.

### The Government Provided Proof of the Wire Transfers

16.     The defendant claims that Counts 4-6 of the indictment should be dismissed, because he claims that "there is scant, if any, proof of the wire transfers and, even, if so, the wiring of funds was not based on any material documents submitted to Corinthian." The wire transfers in Counts 4-6 represent the wire transfer of the funds for closing by Corinthian to the defendant's title company. Debbie Davidson introduced and explained these wire transfers, which are Government's Ex. 45, and explained how these transfers were sent from SouthBank, which is located outside of the State of Florida. Also, Special Agent

Chris Carbonneau testified and showed how the wire transfers were reflected in the defendant's bank account at the American Bank of Hollywood, Government's Ex. 46.

17. Use of the wires is an element of the crime of wire fraud. The use of the wires need not be a central or essential element of the fraudulent scheme. US v. Brennan, 629 F.Supp 283 (ED NY 1986) aff'd 798 F.2d 581. The contents of the actual wiring need not contain any false information. US v. Ross, 131 F.3d 970, 985 (11th Cir. 1997) (similar to "innocent" mailings in mail fraud). The defendant need not send the wires, and the wires need not be sent to the victim. US v. Johnson, 700 F.2d 163 (5th Cir. 1983). Instead, it is only required that the defendant do an act with knowledge that the use of the interstate wires will follow in the ordinary course of business or where such use can be reasonably foreseen, even though not actually intended, then he causes the interstate wires to be used. Pereira v. US, 347 U.S. 1, 8-9 (1954). Certainly, by making the false statements to the lender the defendant was aware that the funds for closing would follow in the ordinary course of business. Thus, this argument of the defendant is wholly without merit.

### Materiality is Not an Element of 18 USC Section 1010

18. The defendant claims that materiality should be an element of a violation of 18 USC Section 1010. However, the Eleventh Circuit has already decided this precise issue in United

States v. DeCastro, 113 F3d 176 (11th Cir. 1997).  Thus, materiality is not an element of 18 USC Section 1010.

### The Decision in Thorn v. United States is Not Applicable

19.   The defendant places great reliance on the decision in United States v. Thorn, 17 F3d 325 (11th Cir. 1997).  However, the decision in Thorn is clearly distinguishable from the instant case.  In Thorn a law firm was obtaining a loan to build a new building.  The loan was to be secured by a mortgage on the property.  At the time the property was subject to 4 mortgages.  It was understood that the lender was to a have first lien.  The closing took place in December 1984, at which time three of the mortgages outstanding on the property had been satisfied, but one had not.  Nine months later the title insurance policy was issued, but the outstanding mortgage was not listed on the Schedule B of the policy.  The policy insured the lender against any losses it might suffer, except for the items listed in Schedule B. Thorn was charged in a 15 count indictment, which includes a count of making a false statement to a federally insured bank by omitting the mortgage on Schedule B of the title policy.  The first trial resulted in a hung jury on this count, and the second trial resulted in a conviction on this count with an acquittal on all the other charges.  The district court granted a motion for acquittal under Rule 29.  The Eleventh Circuit affirmed holding that the omission of the lien from

Schedule was not necessarily a false statement.  The court stated that the defendant made no representations in the title policy regarding the outstanding mortgage, only that the outstanding mortgage was not an exception to the title insurance.  The court stated that the failure to list the outstanding mortgage did not constitute an implied statement that the outstanding mortgage had been released or subordinated.  The Court went on to state that the actions of the defendant in failing to disclose the continued existence of the outstanding mortgage may have constituted bank fraud, but the defendant was acquitted of bank fraud.

20.    In essence the Court in the Thorn decision decided that an omission of fact may not be implied to be a false statement from the circumstances.  In other words if Schedule B had asked for all outstanding liens and the defendant failed to include such a lien then that omission would have clearly been a false statement.  In Thorn Schedule B asked for all items that would be exceptions to coverage under the title policy, the Court ruled that it can not be implied from the circumstances that the omission of the outstanding mortgage was a false statement.

21.    The false statements made by the defendant in this case are clearly distinguishable from the one false statement in Thorn.  In this case the title commitment asks who owns the property, and the defendant puts Silverman's company, American Redevelopment Corporation, which did not own the property.  This

is not an omission of fact that is implied. This is an express misrepresentation. The defendant intentionally stated the wrong owner, because he knew that if he put the true owner the loan would not go through. The Schedule B of the title commitment policy lists all the steps that need to be taken by the title company to give clear title to the lender. The defendant omits the satisfaction of the loan outstanding from the current owner of the property. Again, Ellis and McGhie testified that this omission was made intentionally so that the lender would make the loan on the property. While this is an omission of fact, omissions of fact can constitute false statements under 18 USC Section 1010. See e.g. United States v. Barbato, 471 F2d 918 (1st Cir. 1973)(failure to disclose an outstanding debt an outstanding debt is sufficient to support conviction under 18 USC Section 1010). Even the decision in Thorn notes that the omission of the outstanding mortgage may under the circumstances have been bank fraud, but the jury acquitted the defendant of that charge. In this case the omission of the loan to be satisfied is a false statement as it is in direct response to the question as to what steps need to be taken to give the lender clear title. This false statement did not need to be implied from the circumstances. The are also express false statements with respect to the HUD-1 and HUD-1 addendums. The HUD-1 addendums ask the title agent, the buyer and the seller to certify that the

funds for closing did not come from the seller and are not being reimbursed by the seller. The testimony at trial was that the defendant signed the HUD-1 addendums and caused his staff to sign the HUD-1 addendums even though he knew that they were false. This is an express misrepresentation. This is clearly not an omission that needs to be implied from the circumstances. Similarly, the defendant signed and caused to be signed the HUD-1 settlement statement, which he knew was false as the cash to close was coming from Silverman, not the borrower. Again, this is an express misrepresentation. As the misrepresentations in this case were either express misrepresentations or omissions that did not need to be implied from the circumstances, the decision in <u>Thorn</u> is clearly not applicable.

### There is No Basis to Grant Defendant a New Trial

2Q.    The defendant also asks in the alternative for a new trial. The defendant does not raise any new arguments. Instead, he raises the same arguments that were raised again and again during the course of the trial mainly opposing the granting of the Government's Motion in Limine prior to trial. The government in response incorporates by reference it Motion in Limine, which includes the applicable law in support of the Court's granting, in part of the motion. The defendant also complains of the denial of the introduction of certain proposed jury instructions, which the government argued and the Court agreed were merely

argument.

21.     Federal Rule of Evidence 33 states that on motion of the defendant, the court may grant a new trial if required in the interest of justice.  In United States v. Martinez, 763 F2d 1297 (11th Cir. 1985), the Eleventh Circuit explained the standard to be applied by the district court in deciding whether to grant a new trial under Rule 33:

> While the district court's discretion is quite broad, there are limits to it.  The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.  The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand. Motions for new trials based on weight of the evidence are not favored.  Courts are to grant them sparingly and with caution, doing so only in those really 'exceptional cases.'

In this case the evidence was overwhelmingly in favor of guilt. Thus, there is no basis to grant the defendant's motion for a new trial.

## CONCLUSION

For the foregoing reasons the defendant's Motion for Judgment of Acquittal and in the Alternative for a New Trial must be denied.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____
JEFFREY N. KAPLAN
Assistant United States Attorney
FLA BAR No. A005500030
500 E. Broward Blvd., Suite 700
Fort Lauderdale, Florida 33394
Tel: (954) 356-7255x3515
Fax: (954) 356-7336

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered by United States mail, this 1st day of February, 2002, to: Joel Hirschhorn, Esq., Douglas Center, Penthouse One, 2600 Douglas Road, Coral Gables, Florida 33134.

_____
JEFFREY N. KAPLAN
Assistant United States Attorney