# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

**Thomas K. Kahn**
Clerk

In Replying Give Number
Of Case And Names of Parties

February 17, 2004

Clarence Maddox
Clerk, U.S. District Court
299 E. Broward Blvd
Fort Lauderdale FL 33301

RE: 02-12668-JJ    USA v. Bruce Hollander
DC DKT NO.: 00-06168 CR-DKTH

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued
as the mandate of this court.

Also enclosed are the following:
  Original Exhibits, consisting of: nine boxes, one psi
  Original record on appeal or review, consisting of: fifteen volumes, two volumes supplemental

The district court clerk is requested to acknowledge receipt on the copy of this letter enclosed
to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being mailed to counsel and pro se parties. A copy of the court's decision
was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: James O. Delaney (404) 335-6113

Encl.

MDT-1 (12-2003)

# United States Court of Appeals

## For the Eleventh Circuit

No. 02-12668

District Court Docket No.
00-06168-CR-DKTH

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Nov 13, 2003

THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRUCE HOLLANDER,

Defendant-Appellant.



A True Copy Attested
Clerk U.S. Court of Appeals
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

Appeal from the United States District Court
for the Southern District of Florida

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.



ISSUED AS MANDATE
FEB 1 7 2004
U.S. COURT OF APPEALS
ATLANTA, GA.

Entered:       November 13, 2003
For the Court: Thomas K. Kahn, Clerk
By:           Gilman, Nancy

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 13, 2003
THOMAS K. KAHN
CLERK

---

No. 02-12668

---

D.C. Docket No. 00-0168-CR-DKTH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRUCE HOLLANDER,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Southern District of Florida

---

**(November 13, 2003)**

Before BARKETT and KRAVITCH, Circuit Judges, and FULLAM*, District
Judge.

---

*Honorable John P. Fullam, United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

FULLAM, District Judge:

Appellant Bruce Hollander, an attorney, appeals his conviction on all thirteen counts of a superseding indictment. The first count charged him with participating in a conspiracy to commit mail fraud in violation of 18 U.S.C. §1341, to commit wire fraud in violation of 18 U.S.C. §1343, and to make false statements to the Department of Housing and Urban Development in violation of 18 U.S.C. §1010. Counts 2 through 6 charged him with five substantive wire fraud charges under §1343, Counts 7 through 12 charged him with five substantive false statement charges under §1010, and Count 13 charged him with money-laundering in violation of 18 U.S.C. §§1956(a)(1)(A)(i) and 1956(h). Hollander was sentenced to a total of 51 months imprisonment, followed by three years of supervised release, and was ordered to make restitution in the total sum of $429,329. His appeal challenges the sufficiency of the evidence, and also asserts various trial errors and sentencing issues.

## I. FACTUAL BACKGROUND

Two co-defendants, Mark Cohen and Eric Silverman, both of whom have entered guilty pleas, conducted a joint venture, American Redevelopment Company ("ARC"), which engaged in a series of real estate transactions between

2

December 1996 and September 1999. Their operation involved purchasing

individual homes (the so-called "A to B" transactions) and immediately reselling

them at substantially higher prices, (the so-called "B to C" transactions), arranging

for the ultimate purchasers to obtain HUD-insured mortgages, and closing both

transactions at approximately the same time, so that the proceeds of the HUD-

insured mortgage could be used to pay the original seller. The practice is referred

to in the record as conducting "flip" transactions.

In each instance, it was necessary to utilize the services of a real estate

attorney to conduct the closings and provide title insurance. Initially, Messrs.

Cohen and Silverman used Kenneth Heyder and his company, Security Title and

Escrow, as the title company/closing agent. Appellant Hollander and his

company, Automated Title Services, Inc., replaced the Heyder firm. Between mid-

1997 and early 1998, appellant conducted 42 "flip" transactions for Cohen and

Silverman. All but one of these transactions involved HUD-insured mortgage

loans.

Appellant was not directly involved in the selection and purchasing of the

properties, or in the recruitment of the eventual buyers, or in establishing their

credit-worthiness. The evidence did make clear, however, that appellant

understood the entire operation, and appreciated the necessity of avoiding

3

disclosure of the "flip" nature of the transactions. Accordingly, appellant structured the closing documents in such a way that the HUD-insured mortgage lenders would not learn that the ultimate buyer, "C", their mortgagor, was purchasing the property from "B" at a much higher price than "B" had paid to acquire the property on or about that same day. Appellant achieved that objective by omitting from the title report the date on which the ultimate seller, "B" had acquired title.

In order to qualify for a HUD-insured mortgage, the ultimate purchaser/mortgagor was required to provide at least three percent of the purchase price of the home, using either his own funds or funds representing gifts from relatives or grants from a non-profit organization. In most of the 41 transactions involved in this case, that requirement was evaded. Mr. Silverman would provide the necessary down payment, and then obtain immediate reimbursement from the proceeds of the HUD-insured mortgage. In some instances, appellant himself advanced the money for the down payment.

During the period of his involvement in these activities, appellant was supposed to be paid a retainer of $1,000 per month, plus a fee of $500 per closing. Cohen and Silverman, the principals of ARC, derived profits measured by the difference between the amount of the HUD-insured mortgage which funded the

4

ultimate sale to "C", and the consideration paid by ARC to the original owner,

"A". Generally, ARC sold the properties to the ultimate purchasers for upwards of

$15,000 more than the consideration paid by ARC to the original owners. After

brokerage commissions and closing costs, ARC usually realized several thousand

dollars profit per transaction. Appellant was paid a total of about $58,000 in fees.

## II.  SUFFICIENCY OF THE EVIDENCE

A.    <u>False Statements in Violation of 18 U.S.C. §1010 (Counts 7 through 12)</u>

The HUD fraud statute, 18 U.S.C. §1010 authorizes the criminal

conviction of :

> "Whoever, for the purpose of obtaining any loan or
> advance of credit from any person, partnership,
> association, or corporation with the intent that such loan
> or advance of credit shall be offered to or accepted by
> the Department of Housing and Urban Development for
> insurance ... or for the purpose of influencing in any way
> the action of such department, makes, passes, utters, or
> publishes any statement, knowing the same to be
> false...".

The indictment alleges that the appellant did "knowingly and willfully

make, pass, utter and publish statements, as described below, knowing the same to

be false, and with the intent that such loans be offered to or accepted by HUD for

insurance and for the purpose of influencing the actions of HUD." The "statements" are described as "false documents." The documents alleged to be false include, in each instance, "verification letter, HUD-1 settlement statement and addendum, fund commitment form."

It was the government's theory at trial that the HUD-1 settlement statement and addendum in each case was false because it constituted a statement that, as of the date of settlement, ARC was the owner of the property being sold to the ultimate purchaser, whereas actually ARC was not then the owner of the property and would not obtain title until after obtaining the mortgage proceeds and paying off the actual owner.

The principal thrust of the appellant's argument is that, since the settlement documents did not disclose the date on which ARC acquired title, the documents were merely incomplete rather than false. Hollander relies upon this court's decision in *United States v. Thorn*, 17 F.3d 325 (11th Cir. 1994) which held that, under the bank-fraud statute, §1014, the mere omissions involved in that case did not constitute false statements. The same principle applies under §1010, *see U.S. v. Waechter*, 771 F.2d 974 (6th Cir. 1985). Appellant also relies upon the decision of the Supreme Court in *Williams v. United States*, 458 U.S. 279 (1982) which held that the federal statute prohibiting false statements to banks, 18 U.S.C.

6

§1014, applied only to factual assertions, and not "implicit" representations. The

Court stated:

> "When interpreting a criminal statute that does not
> explicitly reach the conduct in question, we are reluctant
> to base an expansive reading on inferences drawn from
> subjective and variable 'understandings.'" *Id.* at 286.

In *Thorn, supra,* the defendant issued a title commitment guaranteeing that

the property on which the HUD-insured mortgage was about to be placed was free

and clear of all prior liens except those set forth in an attached schedule B.

Defendant intentionally omitted from schedule B a pre-existing mortgage. This

court held that the defendant had not thereby made a false statement in violation of

§1010, although he might have been guilty of bank fraud (of which he had been

acquitted).

The government seeks to distinguish *Thorn* because that defendant had not

made any statement of fact with respect to the pre-existing mortgage, whereas,

according to the government, the closing documents in the present case can

reasonably be interpreted as a statement that ARC owned the property at the start

of the settlement, whereas appellant knew perfectly well it did not.

While the issue is perhaps not free from doubt, we are inclined to believe

the government has the better of the argument. We need not base our decision on

this point, however, since the undisputed evidence shows that in each instance

covered by the indictment, appellant falsely represented that no part of the down

payment was being supplied by the seller, or anyone other than the ultimate

purchaser or relatives of the purchaser.  Appellant well knew that all or part of the

down payment was furnished by ARC or its principals, and, in some instances, by

appellant himself.  Moreover, in the circumstances of this case, it would not have

been unreasonable for the jury to conclude that appellant must have at least

suspected that the co-conspirators were submitting false payroll stubs and other

information bearing upon the supposed credit-worthiness of the ultimate

purchasers.

 We conclude that the trial judge properly denied appellant's motions for

judgment of acquittal on the §1010 counts.

B.    Wire Fraud in Violation of 18 U.S.C. §§1343 and 2 (Counts 2
      through 6)

 In order to convict the appellant on these counts, it was necessary for

the government to prove the existence of a scheme to defraud, appellant's

knowing participation in the scheme, and the use of interstate wire

communications facilities in furtherance of the scheme.  There is no dispute about

the fact that interstate wire communications were used in furtherance of the

activities described above. In challenging his wire fraud convictions, appellant

asserts that there was no fraudulent scheme, since no fraud was involved; that

there were no actual misrepresentations; and that, in any event, there was no proof

that he himself acted with fraudulent intent.

The indictment charged that appellant and his co-conspirators sought "to

obtain money from the lenders and obtain mortgage insurance from HUD by

submitting and causing to be submitted false documentation, inducing them to

fund and/or insure mortgages." In contrast to the § 1010 counts, which require

proof of a false "statement," the wire fraud counts required proof only of "false

documentation." We are satisfied that the jury could properly find that, viewed in

its entirety, the documentation furnished by appellant and his co-defendants was

intended to, and did, create the false impression that these were not "flip"

transactions. Fraud can be committed by intentional omissions of material facts,

as well as by actual statements. *U.S. v. Hasson*, 333 F.3d 1264, 1270-71 (11th Cir.

2003).

Appellant correctly argues that under the wire fraud statute, unlike § 1010,

there must be proof that the false representations were material. But we have no

difficulty in concluding that that requirement was met in this case, since there was

ample evidence (albeit disputed) that the mortgage loans probably would not have

9

been approved if the "flip" nature of the transactions had been disclosed. Moreover, the undisputed evidence showed that HUD would not have insured the mortgages (and the mortgages thus would not have been granted) if the true source of the funds for the down payments had been disclosed.

The jury, under proper instructions on the law, has found that appellant acted with the required fraudulent intent. We conclude that appellant was not entitled to a judgment of acquittal on the wire fraud counts.

C.    Conspiracy

As discussed above, appellant's conviction on the substantive counts finds adequate support in the evidence. There is no dispute about the fact that appellant and his co-defendants were all involved in carrying out the substantive offenses. There is thus no basis for setting aside the conspiracy conviction. Indeed, even if appellant's challenges to the substantive convictions could be sustained, that would not necessarily have affected the conspiracy conviction, since a person may properly be convicted of conspiracy even if its aims were not fulfilled.

### III. JURY INSTRUCTIONS

Appellant contends that the trial judge committed reversible error in

refusing certain of appellant's requests for jury instructions.  Request No. 8 read as follows:

> "Simultaneous Closings
>
> "Simultaneous closings are not illegal.  Closing the "B" to "C" transaction first and even using "C" lender's proceeds to provide the "A" to "B" transaction is not illegal."

And a related request, No. 12, read as follows:

> "Legal to Sell Real Estate You Do Not Own
>
> "It is not illegal to sell real estate you do not own, provided you do acquire title to the same real estate thereafter."

So long as the court's charge correctly states the law and does not mislead the jury, the trial judge has wide discretion in framing the language to be used.  We see no abuse of discretion in declining to address issues which were essentially irrelevant to matters the jury was being asked to decide.  No one suggested that the defendants had violated the law by conducting "flip" transactions, or by selling property not yet acquired.  The court's charge properly focused upon what the jury would need to decide, namely, whether false documentation was involved.

Appellant also complains of the trial court's rejection of his request No. 11:

> "Implied Misrepresentations Not Unlawful
>
> "Bruce Hollander's failure to list, in the title insurance commitments (1) "A" as the record owner (2) the

11

> requirement of a deed from "A" to "B" and (3) the
> omission of the effective date on which "B" was [of]
> record title, does not constitute false statements in the
> title commitments."

Disregarding the grammatical and typographical errors, this request would have

been equivalent to a directed verdict of acquittal, and was properly rejected as

discussed above.

Finally, appellant's request No. 9:

> "Bar Rules and Internal Policies
>
> "You have heard some evidence that certain conduct
> attributed to Mr. Hollander was in violation of Florida
> bar rules, the Corinthian Mortgage Corporation's and the
> Attorneys Title Insurance Fund, Inc.'s internal policies.
> Mr. Hollander is not charged with, or on trial for, any
> alleged violations of the bar rules or lender or fund
> policies."

In the course of the government's case in chief, it was established, without

objection, that as a result of investigations into the activities which resulted in this

prosecution, appellant had been terminated from membership in the Attorneys

Title Insurance Fund for violating the Florida bar rules.  The admissibility of that

evidence is not an issue on appeal.  Since that evidence was in fact received, it

would no doubt have been preferable if the trial judge had included a cautionary

instruction specifically referring to that evidence.  But the court did instruct the

jury that "[t]he defendant is on trial only for those specific offenses alleged in the

indictment." (R. 12 at 125), and nothing in the court's charge or in the closing

arguments of counsel can be viewed as implying that appellant was on trial for

violating bar rules. We are satisfied that, if any error was committed, it was

harmless.

Appellant argues that the trial judge erred in excluding evidence which

would have shown (1) that the sale prices in the second set of transactions (the "B"

to "C" transfers) were not "inflated" as some of the government arguments seemed

to suggest, and (2) that the foreclosure rate on the mortgages involved in the 41

transactions at issue was not substantially higher than the national average for

other HUD-insured mortgages. We reject these arguments. The complete files for

all of the 41 transactions were in evidence, and contained market-value appraisals

purporting to show that the "B" to "C" price was appropriate. No one had argued

otherwise. Appellant's counsel was free to make whatever arguments he wished

to make on that subject.

The subsequent history of these properties was beside the point, and

evidence concerning the percentage of foreclosures was not relevant to any issue

in the case, and might merely have confused matters. The trial judge did not abuse

his discretion in excluding this evidence.

13

## IV. SENTENCING ISSUES

Mr. Hollander was sentenced under the fraud guideline, § 2B1.1, which provides a base offense level of six. The level was increased by 14 because the "loss" exceeded $400,000. Two levels were added because the defendant had been convicted of money laundering, and an additional two levels were added because defendant used his special skills as an attorney. Thus, the total offense level was 24, resulting in a guideline range of 51 to 63 months. Mr. Hollander was sentenced to 51 months, and was ordered to make restitution in the amount of $469,329. Appellant contends that the 14-point upward adjustment should not have been applied, because the losses did not exceed $400,000. He also contends that the restitution ordered is excessive, and that he should have been classified as a minor participant. Alternatively, appellant contends he should have been found eligible for a downward departure based upon the proposition that the calculated loss grossly overstated the severity of his criminal conduct.

The district court held two lengthy sentencing hearings, which featured extended discussions as to whether the government had made available to defense counsel all of the records bearing upon the calculation of loss, and whether defense counsel was raising new issues, as to which the government had

14

insufficient time for response. The zealous advocacy on both sides seems to have

obscured, rather than clarified, many of the issues involved. The district court did

not make any specific findings as to the proper loss figure, or with respect to

restitution, but seems to have generally adopted the calculations set forth in the

pre-sentence report, which were, in turn, based solely upon the prosecutor's

calculations.

The district court's determination of the fraud loss is reviewed for clear

error. *See United States v. Goldberg*, 60 F.3d 1536, 1539 (11th Cir. 1995).

Absolute precision is not required; a reasonable estimate based upon available

information is acceptable. *See United States v. Dominguez*, 109 F.3d 675, 676

(11th Cir. 1997). But when the loss figure is challenged, the government bears the

burden of supporting its loss calculation with "reliable and specific evidence."

*See United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997); *United States

v. Lawrence,* 47 F.3d 1559, 1566 (11th Cir. 1995).

Moreover, the sentencing court must make factual findings which are

sufficient to support the government's claim of the amount of fraud loss attributed

to the defendant in the pre-sentence investigation report. *United States v.

Cabrera,* 172 F.3d 1287, 1294 (11th Cir. 1999); *United States v. Butler,* 41 F.3d

1435, 1442 (11th Cir. 1995), *cert. denied,* 514 U.S. 1121, 115 S.Ct. 1987, 131

L.Ed.2d 874 (1995).

In fraudulent loan cases such as this one, loss is "the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover)." *United States v. Renick*, 273 F.3d 1009, 1025 (11th Cir. 2001). The offense level under the guidelines is based upon the greater of the actual (including expected) loss, or the intended loss. For purposes of restitution, however, the amount should be determined by the actual (including expected) loss.

We perceive several problems with the approach urged by the government and apparently accepted by the district court. The government based its loss calculations on not only the transactions handled by the appellant, but also on some 15 or 16 additional transactions carried out by other title companies, long after appellant ceased handling closings for the co-defendants. This had the effect of increasing the government's calculation of loss from $339,925 to $798,669, thus exceeding the $400,000 threshold for the 14-level increase in offense level. But the appellant is responsible only for criminal activities he agreed to perform or participate in, and for the foreseeable consequences of such undertakings. In the circumstances of this case, we do not believe it can reasonably be held that the appellant agreed to undertake the later closings conducted by competing law firms.

16

Neither can it be said that his knowledge that the co-defendants were likely to, or actually were, conducting additional closings utilizing the services of other firms rendered him criminally responsible for the later closings.

The government makes, in essence, two arguments on these issues. First, the government contends that the appellant must be viewed as having continued as an active member of the overall conspiracy because, allegedly, he took measures to prevent the discovery of the criminal conduct. It appears that, when the parties became aware that an investigation was underway, they compared notes, and appellant allegedly advised the co-defendants to "stonewall." According to the appellant, when he first learned of an impending investigation, he consulted a lawyer who handles criminal cases, and was advised not to provide information to the investigators, and appellant later informed the co-defendants of the substance of the advice given to him by his own lawyer. If appellant's version is correct, it is at least arguable that appellant's attempts to conceal his own activities between mid-1997 and early 1998 should not be regarded as equivalent to continuing membership in the conspiracy during its later stages. The district judge made no findings on these matters.

As a fall-back position, the government argues that, even if appellant is held responsible only for the 41 closings he handled, the intended loss on those

transactions was $615,000. This argument discloses a second fundamental flaw in the government's calculations. The $615,000 figure is predicated on the assumption that the intended loss was $15,000 on each transaction - the average amount of the "flip" (i.e., the difference in sale price between the A to B and B to C transactions). But appellant and his co-defendants were not charged with defrauding A of a property which was worth $15,000 more than B was paying for it, nor with defrauding C into paying $15,000 more than the property was worth. On this record, there is no basis whatever for assuming that the markup itself was fraudulent. A real estate speculator who persuades a property owner to sell at a low price, and then persuades another purchaser to buy the same property at a higher price, may be reaping the benefits of his knowledge of the real estate market, or of his salesmanship, but he is not thereby committing a crime. In each of the loan transactions, the lender's files contain appraisal reports showing that the price being paid by the ultimate borrower was in line with actual market value; there is no suggestion that any of these appraisals was fraudulent, or has ever been questioned.

Appellant and his co-defendants intended to cause the lenders to provide mortgages, and to cause HUD to insure those mortgages. They can therefore be said to have intended to cause whatever losses have been, or can reasonably be

18

expected to be, incurred by the lenders and HUD. As noted above, those losses

are measured by the unpaid balance of the mortgages less the amounts recoverable

from the borrowers or by sale of the collateral.

At first blush it might seem that appellant and his co-defendants caused the

lenders to approve, and HUD to insure, mortgages which were $15,000 higher

than they should have been. But, as noted above, the record does not support any

such inference. Not only is there no evidence of market value to support the

assertion that the A to B transaction reflects the true value of the properties, but

the government's entire theory of prosecution was that, absent the fraud, the

mortgages would not have been approved at all.

The government's calculation of actual and expected losses on the

transactions handled by appellant (including four un-charged transactions

completed through Grant and King) comes to $339,925. If that amount is correct,

it would seem that the 14-point upward adjustment of the offense level was

inappropriate. Moreover, appellant contends that those calculations are supported

only by the government's assertions, rather than by actual evidence from the

pertinent files and records. Appellant also argues that several of the properties

were disposed of in a commercially unreasonable manner. In the absence of

findings on these subjects by the district court, appellate review of these

contentions is not feasible.  The appellant's sentence will therefore be vacated, and

the case remanded for re-sentencing.  Appellant's guideline range should be

calculated on the basis of losses stemming from the transactions appellant himself

handled, unless the sentencing judge finds adequate support in the record for a

conclusion that appellant can properly be charged with responsibility for the

transactions handled by other attorneys/title companies.  With respect to the

transactions handled by appellant, there should be some understandable

explanation of how the losses (actual, expected, or intended) have been calculated.

Any pertinent records of the lending institutions or HUD should be made available

for this purpose.

In addition to the necessity of re-calculating the guideline range, on the

basis of adequate findings concerning losses chargeable to the appellant, the

amount of restitution must also be recalculated, in conformity with the views

expressed above.   The district court will, of course, be free to address any other

issues presented by the parties, including role in the offense and departures.

For all of these reasons, appellant's sentence will be VACATED, and the

case REMANDED for re-sentencing.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia