UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6168-CR-HURLEY/VITUNAC

**NIGHT BOX**
**FILED**

JUN 23 2004

CLARENCE MADDOX
CLERK. USDC/ SDFL / WPB

UNITED STATES OF AMERICA

v.

BRUCE HOLLANDER

_____/

## GOVERNMENT'S OBJECTIONS TO THE
## PRESENTENCE INVESTIGATION REPORT(PSI)

The United States of America, by and through its undersigned counsel, hereby files its objections to the PSI for failing to include an enhancement for aggravating role in the offense or for obstruction of justice, and states as follows:

### PROCEDURAL HISTORY

1.    In September 2001 the defendant was charged in a thirteen count superseding indictment with one count of conspiracy to commit mail and wire fraud and submitting false statements to a lender in order to obtain a loan insured by HUD, five counts of wire fraud, six counts of submitting false statements to a lender in order to obtain a loan insured by HUD, and one count of money laundering. In November 2001 this matter was tried over a seven day period, and the jury returned a verdict of guilty as to each count of the indictment.

2.    After the defendant was convicted the PSI was prepared reflecting that the defendant's offense level was determined to be

1

level 24 and the criminal history was a category I, a sentencing guideline range of 51-63 months.

3.    At the initial sentencing the District Court Judge denied each of the defendant's objections and sentenced the defendant to 51 months.  The defendant appealed his conviction and his sentence.  The Eleventh Circuit affirmed his conviction, but ordered that defendant's sentence be vacated and remanded for resentencing.  The main thrust of the opinion is that there should be some understandable explanation as to how the losses and restitution have been calculated.  The Eleventh Circuit also left this Court free to address any other issues presented by the parties including roles and departures.

4.    On or about June 4, 2004, a revised PSI was issued by the Probation Office which incorporated the changes noted by the opinion of the Eleventh Circuit.  After the revisions the guideline range remained the same, 51-63 months.

### FACTUAL BACKGROUND

5.    The evidence adduced at trial showed that defendant Hollander, as a lawyer and title agent, handled "land flip" transactions for American Redevelopment Company (ARC), whose principals were co-defendants, Marc Cohen(COHEN) and Eric Silverman (SILVERMAN) (DE:293:154-55;DE 294:150).  In late 1996 Mark Cohen went into partnership with Eric Silverman (DE:295:28).  They would solicit unsophisticated, first time home buyers to purchase homes.

2

They would show the buyers various homes. When the buyers were ready to purchase a home, Cohen and Silverman, through Silverman's company, American Redevelopment Corporation (ARC), would enter into a contract to buy the house and then enter into a second contract to sell the house to the first-time home buyer for approximately $15,000 more than ARC purchased it (DE:295:19-29). The closing for both of the sales would take place on the same date (DE:295:31). These type of transactions are known as "flip" transactions, where an investor buys property and immediately "flips" or sells the property for an immediate profit.

6.    Many lending institutions do not like to fund "flip" transactions.  In order to lawfully execute a "flip" transaction the lending institution must be apprized of both the purchase and the immediate resale.  In this case a representative of the main lender, Corinthian Mortgage (Corinthian), testified at trial that if Corinthian discovered a flip transaction it would have reviewed the appraisal and questioned the broker and seller to determine whether any improvements had been made which justified the increased value between the two transactions (DE:294:59).  If no improvements were made that could justify the increase in price, the loan would not be approved (DE:294:59).

7.    Silverman met defendant Hollander, when Silverman previously worked for a mortgage broker.  Silverman introduced Cohen to defendant Hollander when Cohen needed a lawyer for a

3

pending state criminal charge (DE:295:21). Cohen had violated the
Loan Brokers Prohibited Acts by taking advanced fees from
prospective purchasers, which were part of a land flip scheme
(DE:295:19-20). During his representation of Cohen in the State
criminal case defendant Hollander would ask Cohen if Cohen could
forward any real estate business to him. At the time Cohen and
Silverman were doing their fraudulent "land flip" deals through
another title company. However, in May 1997, their prior title
agent, Ken Heyder, felt it was no longer worth the trouble, so
Cohen and Silverman needed a new title company to do their
fraudulent title commitments. On or about May 22, 1997, defendant
Hollander negotiated a plea for Cohen, wherein Cohen received three
years probation (DE:295:21). On May 22, 1997, the same day that
the defendant pled Cohen to probation, Hollander did the first
closing for Cohen and Silverman in their fraudulent land flip deals
(DE:295:39-40).

8.    Defendant Hollander was aware of the fraudulent scheme
from the beginning. (DE:295:38-39)(DE:296:20). Silverman
testified, "We told [Hollander] completely everything, that these
were all flip transactions, we did not have ownership to the
property and how the deals were constructed, how the title
commitments would have to read so as not to arouse any suspicion"
(DE:296:13). In order for this fraudulent land flip scheme to
succeed, the title company must not reflect the initial purchase by

4

ARC in the title commitment. Co-defendants Cohen and Silverman both testified that prior to their first transaction with the defendant there was a telephone conference between the mortgage broker, Roni Oz (OZ), and the defendant with both Cohen and Silverman present at the defendant's law office (DE:296:14-17). Oz told the defendant that the lenders would not fund if the title commitment reflected the true owner (DE:295:41)(DE:296:16-17). Cohen and Silverman both testified that the defendant agreed to falsely prepare the title commitments for Cohen and Silverman, but that he would omit the effective date (DE:295:41)(DE:296:16).

9. Two of defendant's employees, Terry Ellis and Lybea McGhie, testified that they were told by the defendant to falsely prepare the title commitments or else the lenders would not make the loans (DE:293:158)(DE:294:152). Defendant Hollander explained to Ms. Ellis that "[t]he ultimate buyer borrowing from the lender was not going to get a loan approved if, in fact, we showed any other seller than title vested as American Redevelopment...meaning the actual owner of the property could not be shown on that title commitment or the lender would deny a loan because it was a flip transaction"(DE:293:158). Ms. Ellis, who was provided immunity from prosecution, and Ms. McGhie both testified that they falsely prepared the title commitments for defendant Hollander's review and signature as directed by the defendant, because he was their boss and they did what they were told (DE:293:38)(DE:294:17-18).

10.    Cohen, Silverman, and McGhie also testified that the defendant executed and caused to be executed at the closings false HUD-1 settlement statements and HUD-1 addendums.  These false statements involved the reimbursement of gift funds by the defendant to Silverman.    A HUD insured loan for the purchase of a person's primary residence requires that a minimum cash investment be made by the borrower from his or her own funds of at least 3% of the purchase price to be used for closing costs and the down payment.  If the borrower did not have the funds personally, those funds could be provided to the borrower by certain persons and entities as a gift.  However, the seller was not permitted to provide the funds to the borrower.

11.    The testimony at trial was that by September 1997 the defendant became aware that Silverman would unlawfully provide the funds to the buyer.  Silverman, Cohen, and McGhie all testified that in September 1997 there were a number of closings on the same or successive days.  Silverman needed funds for the gift checks, so McGhie directed Silverman to see the defendant.  The defendant then directed McGhie to issue a check to Silverman in the amount of the gift funds, so that Silverman could go to the bank, cash the check and return with the gift funds.  Even though the defendant was aware that Silverman was paying the gift funds, the evidence at trial was that the defendant directed his employees to falsely prepare the HUD-1 statments and the defendant executed the HUD-1

6

settlement statements falsely reflecting that gifts were coming from the buyers and HUD-1 addendums falsely stating that the buyers were not being reimbursed by the seller for the gift funds.

12.    In all from May 1997 through May 1998 the defendant executed 41 false title commitments for Cohen and Silverman and numerous false HUD-1's and HUD-1 addendums.    In January 1998 the defendant's underwriter, Attorney's Title, decided to no longer insure the defendant's title policies (DE:294:173).    The defendant could no longer do the title work for Cohen and Silverman, except for one last file for which he used another attorney, David Javits (DE:294:177).    The defendant prepared the title work and falsely prepared the title commitment (DE:294:178-181).    David Javits, whose office did the closing was apparently an unwitting participant.

13.    In or about November 1997 Corinthian sent a letter to Roni Oz regarding a first payment default by a borrower (DE:295:54-55).    The first payment default spurred a quality control check by Corinthian where they called to verify the borrower's employment (DE:295:54-55).    In addition to the fraudulent title commitments and false HUD-1's and HUD-1 addendums which the defendant caused to be prepared, Cohen and Silverman were falsifying W-2's, pay stubs and employment verifications.    Cohen and Silverman met with defendant Hollander about the Corinthian letter.    They had been paying defendant Hollander a $1,000 a month retainer, which was in

addition to the fees from the closings (DE:295:56-57).

14.     Cohen and Silverman told the defendant about the Corinthian investigation and the false employment information. Defendant Hollander told Cohen and Silverman how to proceed so the situation with Corinthian did not escalate (DE:296:38). Defendant Hollander gave Cohen and Silverman talking points as to what to say if they were approached (DE:296:38). Defendant Hollander told Silverman to say that he was just a seller and that he had no knowledge of any irregularities (DE:296:38). In fact, Silverman knew and participated in the mortgage irregularities and defendant Hollander was telling Silverman to lie. Similarly, he told Cohen to say that he had no knowledge of the false employment information as it came from the borrower (DE:296:39). Oz was to say that Cohen was one of his brokers and he had no idea of any irregularities (DE:296:39).

15.     In or about the summer of 1998 Silverman received a call from auditors from HUD, Eileen Leung and Will Nixon, who wanted to set up a meeting with Silverman (DE:296:40). HUD auditors began an audit of Oz' company, PAMI, after receiving a complaint from Corinthian (DE:295:142-143). Silverman said he felt panicked so he called up defendant Hollander to see what he should do (DE:296:40-41). Silverman testified that defendant Hollander told him "[n]ot to mention anything about flip transactions, straw buyers, anything like that (DE:296:41)."

Defendant Hollander told Silverman to say that he knew Cohen, but that Silverman "[h]ad no idea of any of the falsifications (DE:296:41)." Silverman testified that defendant Hollander was telling him to lie to the HUD auditors, and that the "[g]oal was to squash this investigation from it proceeding" by getting their stories lined up so they made sense so that HUD would close their investigation (DE:296:41-42). Shortly after meeting with defendant Hollander, Silverman had a meeting with the HUD auditors (DE:296:42). Silverman admitted at trial that he lied to the HUD auditors (DE:296:43). Silverman testified at trial that the reason he lied to the HUD auditors was:

> These were the talking points we went over. This is what I went over with Bruce. This is the goal, so that this thing wouldn't proceed any further. I had never been in a situation like this before. I did not know what to do, so I relied on him. (DE:296:43).

17.    Silverman later got concerned about lying to HUD and called a criminal defense attorney and decided to cooperate with the government (DE:296:44-45). On October 22, 1999, Silverman made a consensual telephone call to defendant Hollander, which was Government Ex. 62 (DE:296:52). During the course of the conversation defendant Hollander discussed how he met with Silverman prior to the meeting with the HUD auditors and determined it was better to stonewall HUD (DE:296:52-53). Silverman testified that meant to give the HUD auditors "[a] little or as much misinformation to make this thing go away (DE:296:53)."

18.    HUD auditor Eileen Leung, who now goes by the name
Eileen Tam, testified at the trial regarding her attempts to obtain
information from defendant Hollander.    Tam testified that she began
an  audit  of  Oz'  company,  PAMI,  based  on  a  complaint  from
Corinthian.  On August 12, 1998, Tam contacted the defendant and
requested four files relating to the closings he did for Cohen and
Silverman(DE 295:151).  It took the defendant until October 9 [th],
eight weeks, to provide Tam with some of the records regarding the
request (DE 295:152).  Tam asked the defendant to reconcile the pay
out information in his records as there were discrepancies in the
information, but the defendant claimed that he could not reconcile
the information (DE:295:152).  On October 20, 2997, Tam sent a
letter  to  the defendant requesting additional documents and
clarification  on  the  reconciliation,  plus information on six
additional files (DE:295:153).    Tam specifically requested the
initial HUD-1 settlement statement between the previous buyer and
ARC (DE:295:153).    Between October 20, 1997, and January 12, 1998,
there were approximately 15 contacts between the defendant and the
HUD auditors (DE:295:154-161).  The defendant failed to reconcile
the payout information or provide the HUD-1 between the previous
buyer and ARC (DE:295:162).  On January 12, 1998, Tam sent a letter
to defendant Hollander stating that the audit was winding down and
she needed the information no later than January 26th (DE:295:161-
162).  On January 26th the defendant called Tam and told her that

the reason she was not able to reconcile the files is that she did not have the HUD-1 between the prior owner and ARC, which is exactly the information she requested in October (DE:295:162). On January 27th the defendant complied with the records request, but the defendant did not reconcile the pay out information (DE:295:163).

### GOVERNMENT'S OBJECTIONS TO THE PSI

19.    The government objects to the most recent version of the PSI as it should reflect two additional enhancements for managerial role and obstruction of justice. The government objects to paragraphs 23 and 45, which fail to reflect that the defendant should receive an enhancement for both abuse of trust under 3B1.3 of the Sentencing Guidelines and managerial role under Section 3B1.1 of the Sentencing Guidelines. Paragraph 45 currently reflects that the defendant used his special skills as an attorney and he used his position as a fiduciary to promote the scheme. Paragraph 45 should reflect that the defendant was a fiduciary to each of the parties to the closing and abused the trust of those parties by falsely preparing or causing to be prepared HUD-1 settlement statements reflecting gifts being paid by the borrowers. The government also objects to paragraphs 34 and 46 of the PSI, which reflect that there is no information indicating that the defendant impeded or obstructed justice. The government also objects to paragraph 111, which reflects that there are no factors,

which warrant a departure. The government has filed a separate motion for upward departure.

## THE DEFENDANT SHOULD BE ENHANCED FOR HIS ROLE IN THE OFFENSE

20.    Section 3B1.1(b) of the Sentencing Guidelines states that a defendant's offense level should be increased three points if the defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive. In this case there were ten people who were indicted and convicted, along with a number of other persons who were criminally culpable, but not charged. Thus, there were clearly five or more participants in the criminal activity.

21.    The main issue is whether the defendant was a manager or supervisor of any of those participants. Application Note 1 of Section 3B1.1 states that a participant is a person who is criminally responsible for the commission of the offense, but need not have been convicted. Participants are persons who were (i) aware of the criminal objective, and (ii) knowingly offered their assistance. See United States v. Anthony, 280 F.3d 694 (6th Cir. 2002). An individual who is merely an "unknowing facilitator" of a crime is not a criminally responsible participant under Section 3B1.1. See United States v. Hall, 101 F.3d 1174, 1178 (7th Cir.1996); United States v. Tai, 41 F.3d 1170, 1174 (7th Cir.1994). But, an individual who gives "knowing aid in some part of the criminal enterprise is a 'criminally responsible' participant,"

<u>Hall</u>, 101 F.3d at 1178, even if the individual is not convicted, Section 3B1.1, comment. (n. 1); <u>United States</u> v. <u>Bush</u>, 79 F.3d 64, 67 (7th Cir.1996) (wife who filled out fraudulent worker's compensation claim form at defendant's request was criminally responsible participant). <u>United States</u> v. <u>Michalek</u>, 54 F.3d 325, 333-34 (7th Cir.1995) (defendant's wife was criminally responsible participant even though she was not convicted of bankruptcy fraud).

22.    In <u>United States</u> v. <u>Gerstein</u>, 104 F.3d 973, 980-81 (7th Cir.1997) a defendant used five of his employees to commit bank fraud by overstating his accounts receivable that were used as collateral for a business loan. These employees were not charged and were interviewed by the FBI and used as potential witnesses against the defendant. The Seventh Circuit upheld the enhancement stating that the nature of employees' acts in creating false documents demonstrated that they "had first-hand knowledge that they were involved in criminal activity" and were thus criminally responsible participants under Section 3B1.1.

23.    In this case the defendant supervised at least two of his employees, Terry Ellis and Lybea McGhie, in creating false documents. Both were experienced real estate paralegals. Ms. Ellis had been a real estate closer for 25 years (DE:293:150-151). Ms. McGhie had been a real estate closer for approximately 12 years (DE:294:145). The testimony of both Ms. Ellis and Ms. McGhie at trial showed that they had knowledge of the object of the

conspiracy when they testified that they were told by the defendant to falsely prepare the title commitments or else the lenders would not make the loans (DE:293:158)(DE:294:152).  Defendant Hollander explained to Ms. Ellis that "[t]he ultimate buyer borrowing from the lender was not going to get a loan approved if, in fact, we showed any other seller than title vested as American Redevelopment...meaning the actual owner of the property could not be shown on that title commitment or the lender would deny a loan because it was a flip transaction"(DE:293:158).

24.    Ms. Ellis was provided immunity from prosecution. Although Ms. Ellis did wonder why she needed the immunity request (294:21-23), she testified that she knew that preparing the title commitments incorrectly was wrong (DE:294:39-40).   Ms. Ellis and Ms. McGhie both testified that they falsely prepared the title commitments for defendant Hollander's review and signature as directed by the defendant, because he was their boss and they did what they were told (DE:294:38)(DE:295:17-18).

25.    Ms. McGhie also testified that she was directed to falsely prepare and execute the HUD-1 and HUD-1 addendums at the direction of the defendant.  The testimony at trial was that in September 1997 there were a number of closings on the same or successive days.  Silverman did not have enough money to close. McGhie was the real estate closer on the transaction.  McGhie directed Silverman to see the defendant.  The defendant then

directed McGhie to issue a check to Silverman in the amount of the gift funds, so that Silverman could go to the bank, cash the check and return with the gift funds (DE:294:197). Ms. McGhie testified that even though the defendant was aware that Silverman was paying the gift funds, he directed his employees to falsely prepare the HUD-1 statements and the defendant executed the HUD-1 settlement statements falsely reflecting that gifts were coming from the buyers and HUD-1 addendums falsely stating that the buyers were not being reimbursed by the seller for the gift funds. Ms. McGhie became concerned. Her concern was evidenced by an entry on a disbursement sheet for $4,000 to Eric Silverman. She put a notation next to the entry "Per Bruce." When asked at trial as to why she made the entry she responded as follows, "[B]ecause I knew it was something that should not have been done and I just wanted to cover myself (DE:294:199-200). Thus, even though Ms. Ellis and Ms. McGhie were not charged, they were still criminal participants. As the defendant directed them he should be enhanced for a managerial role.

26.    The defendant's offense level should also be enhanced under Section 3B1.1(b) of the Sentencing Guidelines as the criminal activity was otherwise extensive.

27.    Section 3B1.3 of the Sentencing Guidelines states that a defendant may receive an enhancement for both abuse of trust and managerial role, but may not receive an enhancement for special

skill and managerial role.   In this case the defendant has received a two level enhancement, which appears to be for both abuse of trust and special skill.    James Mack, a witness called by the defense at trial testifed that the defendant as a settlement or closing agent for these transactions had a fiduciary duty to all parties to the transaction, including the lender (DE:282:239). Mr. Mack testified that a title agent violates that duty if he misleads the lender (DE:282:240).    In this case the defendant clearly misled the lender in all 41 transactions by falsifying the title commitments, the HUD-1's and the HUD-1 addendums.   Thus, the defendant abused the trust of the lender, Corinthian, which he had as a closing  and title agent.  Since the defendant should be enhanced for abuse of trust, he can also be enhanced for his managerial role.

## THE DEFENDANT OBSTRUCTED JUSTICE

28.      Section 3C1.1 of the Sentencing Guidelines states that a defendant's offense level is increased by two levels if:

> (A)the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation...of the instant offense of conviction, and (B)the obstructive conduct  related  to  (i)  the defendant's offense of conviction and any relevant conduct...

Application Note 4 to Section 3C1.1 of the Sentencing Guidelines provides a non-exhaustive list of examples of the types of conduct to  which  the  obstruction  of  justice  enhancement  applies.

Application Note 4(d) includes as obstructive conduct concealing or directing another person to conceal evidence that is material to an official investigation.

29.    In this case after co-defendant Silverman was contacted by HUD auditors he met with defendant Hollander to discuss what things Silverman should conceal from the HUD auditors. Particularly, Silverman testified that defendant Hollander told him, among other things, to say that he was merely an investor and did not know anything about false gift checks or employment verifications (DE: 296:40-41). Silverman testified that their "[g]oal was to squash this investigation from it proceeding (DE:296:41)." At trial Silverman admitted that he had lied to the HUD auditors (DE:296:43). Silverman lied to the auditors when he denied that he was knew about incidences of falsified gift funds and verification of employment. Silverman testified that the reason he lied was that these were the talking points he went over with defendant Hollander so that this proceeding did not proceed any further (DE:296:43).

30.    The HUD audit was an "official investigation." Although the HUD audit was a civil investigation, it is an official investigation under Section 3C1.1 provided that there is a close connection between the obstructive conduct and the offense of conviction. See United States v. McGovern, 329 F. 3d 247 (1st Cir. 2003); see also United States v. Bennett, 252 F. 3d 559, 566 (2d

Cir. 2001)(obstruction adjustment allowed where defendant obstructed only the civil SEC investigation and not criminal prosecution); <u>United States</u> v. <u>Zagari</u>, 111 F. 3d 307, 328-29(2d Cir. 1997)(perjury in a civil regulatory suit can support obstruction enhancement where the connection between the two cases is close); <u>United States</u> v. <u>Mills</u>, 194 F. 3d 1108, 1115 (10th Cir. 1999)and <u>United States</u> v. <u>Barry</u>, 938 F. 2d 1327, 1335 (D.C. Cir. 1991).  In this case the obstructive conduct directly involves the offense of conviction.  In <u>United States</u> v. <u>Kirkland</u>, 985 F. 2d 535, 538 (11th Cir. 1993), the Eleventh Circuit stated that an official investigation under 3C1.1 of the Guidelines involves some type of law enforcement or other action by government employees acting within the course and in furtherance of their official duties.  In   <u>Kirkland</u>, the Eleventh Circuit cites for this proposition the First Circuit holding in <u>United States</u> v. <u>Pilgrim Market Corp.</u>, 944 F. 2d 14 (1st Cir. 1991).  In <u>Pilgrim Market</u>, the defendant obstructed an administrative investigation by the USDA of the sale of contaminated meat.  The First Circuit held that the enhancement under 3C1.1 of the Guidelines was applicable as the subject matter of the civil investigation and the indictment were the same, and the obstructive conduct was meant to hide evidence of criminal wrongdoing. Id. At 20-21.

     31.     This case is factually distinguishable from<u>Kirkland</u>. In <u>Kirkland</u> the Eleventh Circuit reversed an obstruction

enhancement  for false statements made to bank officials
investigating a bank embezzlement stating that the investigation by
bank personnel alone was not an "official" investigation under
3C1.1.  The Court concluded that "[B]ecause no official
investigation connected to law enforcement or any other
governmental entity had been initiated, Kirkland's acts merely
furthered a scheme of conduct constituting the crime of
embezzlement by a bank officer." 985 F.2d at 538.  In this case the
investigation was by HUD, a governmental agency.  The Eleventh
Circuit also noted that the district court erred in finding that
Kirkland caused a third person to give perjured testimony to
investigating officers, since the statements were not made under
oath.  While the statements to the investigating agents in this
case were not under oath, a defendant may receive an enhancement
under 3C1.1 of the Sentencing Guidelines for false statements that
are not made under oath.  See e.g. <u>United States</u> v. <u>Sullivan</u>, 28 F.
Supp 2d 1365 (S.D. Fla. 1998).

32.  The defendant also qualifies for the obstruction
enhancement as he himself concealed documents from the HUD
auditors.  He hid from the HUD auditors the HUD-1's that they
requested that the defendant prepared for the closings between ARC
and the original owners.  The defendant did not turn over these
documents as they would have clearly shown when matched to the HUD-
1 of the sale by ARC that the transactions were "flip"

19

transactions.    The HUD auditors had approximately 15 contacts from October 1997 through January 1998 wherein the HUD auditors requested these and other documents and requested that the defendant reconcile his records.    Only after the defendant was given a "drop dead" date of January 26, 1998, did the defendant comply with the records request and the defendant still failed to reconcile any of the accounts.    The defendant's actions were consistent with the testimony of Silverman wherein he testified that the defendant told him not to give information regarding the flip transactions and to try to delay the investigation so that the HUD auditors would give up.    For all of the defendant's actions designed to obstruct the investigation, the defendant should receive the enhancement under 3C1.1 of the Guidelines.

## CONCLUSION

33.    For the foregoing reasons each of the government's objections to the PSI should be granted and the defendant should be sentenced within a guideline range of 87-108.

months                                        Respectfully submitted,

                                             MARCOS DANIEL JIMENEZ
                                             UNITED STATES ATTORNEY
                                             By:

                                             _____
                                             JEFFREY N. KAPLAN
                                             Assistant United States Attorney
                                             FLA BAR No.  A005500030
                                             500 E. Broward Blvd., Suite 700
                                             Fort Lauderdale, Florida 33394
                                             Tel: (954) 356-7255x3515
                                             Fax: (954) 356-7336

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered by United States mail, this _____ day of June, 2004, to: Joel Hirschhorn, Esq., Douglas Center, Penthouse One, 2600 Douglas Road, Coral Gables, Florida 33134, and Georgann Stanley, Supervising United States Probation Officer, 299 East Broward Blvd., Suite 409, Fort Lauderdale, Fl. 33301-1865.

JEFFREY N. KAPLAN
Assistant United States Attorney

21