UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>00-6168-CR-HURLEY/VITUNAC</u>

NIGHT BOX FILED
JUN 23 2004
CLARENCE MADDOX
CLERK, USDC / SDFL / WPB

UNITED STATES OF AMERICA

v.

BRUCE HOLLANDER
_____/

## GOVERNMENT'S MOTION FOR UPWARD DEPARTURE

The United States of America, by and through its undersigned counsel, hereby files its Motion For upward Departure due to defendant's egregious conduct as an attorney, and states as follows:

### BACKGROUND

1. The evidence adduced at trial showed that defendant Hollander, as a lawyer and title agent, handled "land flip" transactions for American Redevelopment Company (ARC), whose principals were co-defendants, Marc Cohen(COHEN) and Eric Silverman (SILVERMAN) (DE:293:154-55;DE 294:150). In late 1996 Mark Cohen went into partnership with Eric Silverman (DE:295:28). They would solicit unsophisticated, first time home buyers to purchase homes. They would show the buyers various homes. When the buyers were ready to purchase a home, Cohen and Silverman, through Silverman's company, American Redevelopment Corporation (ARC), would enter into

1

a contract to buy the house and then enter into a second contract to sell the house to the first-time home buyer for approximately $15,000 more than ARC purchased it (DE:295:19-29). The closing for both of the sales would take place on the same date (DE:295:31). These type of transactions are known as "flip" transactions, where an investor buys property and immediately "flips" or sells the property for an immediate profit.

2.  Silverman met defendant Hollander, when Silverman previously worked for a mortgage broker. Silverman introduced Cohen to defendant Hollander when Cohen needed a lawyer for a pending state criminal charge (DE:295:21). Cohen had violated the Loan Brokers Prohibited Acts by taking advanced fees from prospective purchasers, which were part of a land flip scheme (DE:295:19-20). During his representation of Cohen in the State criminal case defendant Hollander would ask Cohen if Cohen could forward any real estate business to him. At the time Cohen and Silverman were doing their fraudulent "land flip" deals through another title company. However, in May 1997, their prior title agent, Ken Heyder, felt it was no longer worth the trouble, so Cohen and Silverman needed a new title company to do their fraudulent title commitments. On or about May 22, 1997, defendant Hollander negotiated a plea for Cohen, wherein Cohen received three years probation (DE:295:21). On May 22, 1997, the same day that the defendant pled Cohen to probation, Hollander did the first

closing for Cohen and Silverman in their fraudulent land flip deals (DE:295:39-40). The next closing was a couple of weeks later on June 6, 1997.

3. Defendant Hollander was aware of the fraudulent scheme from the beginning. (DE:295:38-39)(DE:296:20). Silverman testified, "We told [Hollander] completely everything, that these were all flip transactions, we did not have ownership to the property and how the deals were constructed, how the title commitments would have to read so as not to arouse any suspicion" (DE:296:13). In order for this fraudulent land flip scheme to succeed, the title company must not reflect the initial purchase by ARC in the title commitment. Co-defendants Cohen and Silverman both testified that prior to their first transaction with the defendant there was a telephone conference between the mortgage broker, Roni Oz (OZ), and the defendant with both Cohen and Silverman present at the defendant's law office (DE:296:14-17). Oz told the defendant that the lenders would not fund if the title commitment reflected the true owner (DE:295:41)(DE:296:16-17). Cohen and Silverman both testified that the defendant agreed to falsely prepare the title commitments for Cohen and Silverman, but that he would omit the effective date (DE:295:41)(DE:296:16).

4. In all from May 1997 through May 1998 the defendant executed 41 false title commitments for Cohen and Silverman and numerous false HUD-1's and HUD-1 addendums. In January 1998 the

defendant's underwriter, Attorney's Title, decided to no longer insure the defendant's title policies (DE:294:173). The defendant could no longer do the title work for Cohen and Silverman, except for one last file for which he used another attorney, David Javits (DE:294:177). The defendant prepared the title work and falsely prepared the title commitment (DE:294:178-181). David Javits, whose office did the closing was apparently an unwitting participant.

    5.    In or about November 1997 Corinthian sent a letter to Roni Oz regarding a first payment default by a borrower (DE:295:54-55). The first payment default spurred a quality control check by Corinthian where they called to verify the borrower's employment (DE:295:54-55). In addition to the fraudulent title commitments and false HUD-1's and HUD-1 addendums which the defendant caused to be prepared, Cohen and Silverman were falsifying W-2's, pay stubs and employment verifications. Cohen and Silverman met with defendant Hollander about the Corinthian letter. They had been paying defendant Hollander a $1,000 a month retainer, which was in addition to the fees from the closings (DE:295:56-57).

    6.    Cohen and Silverman told the defendant about the Corinthian investigation and the false employment information. Defendant Hollander told Cohen and Silverman how to proceed so the situation with Corinthian did not escalate (DE:296:38). Defendant Hollander gave Cohen and Silverman talking points as to what to say

4

if they were approached (DE:296:38). Defendant Hollander told Silverman to say that he was just a seller and that he had no knowledge of any irregularities (DE:296:38). In fact, Silverman knew and participated in the mortgage irregularities and defendant Hollander was telling Silverman to lie. Similarly, he told Cohen to say that he had no knowledge of the false employment information as it came from the borrower (DE:296:39). Oz was to say that Cohen was one of his brokers and he had no idea of any irregularities (DE:296:39).

7. In or about the summer of 1998 Silverman received a call from auditors from HUD, Eileen Leung and Will Nixon, who wanted to set up a meeting with Silverman (DE:296:40). HUD auditors began an audit of Oz' company, PAMI, after receiving a complaint from Corinthian (DE:295:142-143). Silverman said he felt panicked so he called up defendant Hollander to see what he should do (DE:296:40-41). Silverman testified that defendant Hollander told him "[n]ot to mention anything about flip transactions, straw buyers, anything like that (DE:296:41)." Defendant Hollander told Silverman to say that he knew Cohen, but that Silverman "[h]ad no idea of any of the falsifications (DE:296:41)." Silverman testified that defendant Hollander was telling him to lie to the HUD auditors, and that the "[g]oal was to squash this investigation from it proceeding" by getting their stories lined up so they made sense so that HUD would close their

5

investigation (DE:296:41-42). Shortly after meeting with defendant Hollander, Silverman had a meeting with the HUD auditors (DE:296:42). Silverman admitted at trial that he lied to the HUD auditors (DE:296:43). Silverman testified at trial that the reason he lied to the HUD auditors was:

> These were the talking points we went over. This is what I went over with Bruce. This is the goal, so that this thing wouldn't proceed any further. I had never been in a situation like this before. I did not know what to do, so I relied on him. (DE:296:43).

8. Silverman later got concerned about lying to HUD and called a criminal defense attorney and decided to cooperate with the government (DE:296:44-45). On October 22, 1999, Silverman made a consensual telephone call to defendant Hollander, which was Government Ex. 62 (DE:296:52). During the course of the conversation defendant Hollander discussed how he met with Silverman prior to the meeting with the HUD auditors and determined it was better to stonewall HUD (DE:296:52-53). Silverman testified that meant to give the HUD auditors "[a] little or as much misinformation to make this thing go away (DE:296:53)."

9. HUD auditor Eileen Leung, who now goes by the name Eileen Tam, testified at the trial regarding her attempts to obtain information from defendant Hollander. Tam testified that she began an audit of Oz' company, PAMI, based on a complaint from Corinthian. On August 12, 1998, Tam contacted the defendant and requested four files relating to the closings he did for Cohen and

6

Silverman(DE 295:151). It took the defendant until October 9th, eight weeks, to provide Tam with some of the records regarding the request (DE 295:152). Tam asked the defendant to reconcile the pay out information in his records as there were discrepancies in the information, but the defendant claimed that he could not reconcile the information (DE:295:152). On October 20, 2997, Tam sent a letter to the defendant requesting additional documents and clarification on the reconciliation, plus information on six additional files (DE:295:153). Tam specifically requested the initial HUD-1 settlement statement between the previous buyer and ARC (DE:295:153). Between October 20, 1997, and January 12, 1998, there were approximately 15 contacts between the defendant and the HUD auditors (DE:295:154-161). The defendant failed to reconcile the payout information or provide the HUD-1 between the previous buyer and ARC (DE:295:162). On January 12, 1998, Tam sent a letter to defendant Hollander stating that the audit was winding down and she needed the information no later than January 26th (DE:295:161-162). On January 26th the defendant called Tam and told her that the reason she was not able to reconcile the files is that she did not have the HUD-1 between the prior owner and ARC, which is exactly the information she requested in October (DE:295:162). On January 27th the defendant complied with the records request, but the defendant did not reconcile the pay out information (DE:295:163).

## **THE DEFENDANT SHOULD RECEIVE AN UPWARD DEPARTURE UNDER 5K2.0**

10.     Under Section 5K2.0 of the Sentencing Guidelines the court may depart upward if there is an aggravating circumstance of a kind, or to a degree, not adequately taken into account by the Sentencing Commission in formulating the Guidelines.  In Koon v. United States, 518 U.S. 81 (1996) the Supreme Court held that in deciding whether a departure is applicable the Court must determine if there are features of the case that take it outside of the Guidelines' "heartland" and make it a special or unusual case. Such departures are "reserved for 'unusual' cases where there is something atypical about the defendant or the circumstances surrounding the commission of the crime which significantly differ from the normal or 'heartland' conduct in the commission of the crime." United States v. Gonzalez-Lopez, 911 F.2d 542, 549 (11th Cir.1990) (quoting United States v. Williams, 891 F.2d 962, 964 (1st Cir.1989)).

11.     In this case the defendant was co-defendant Cohen's criminal defense attorney in a State case involving violations of the Loan Broker's Prohibited Acts statute.  Cohen had violated the Loan Broker's Prohibited Acts by taking advanced fees from prospective purchasers, which were part of a land flip scheme (DE:295:19-20).  During his representation of Cohen in the State criminal case defendant Hollander would ask Cohen if Cohen could forward any real estate business to him.  At the time Cohen and

Silverman were doing their fraudulent "land flip" deals through another title company. However, in May 1997, their prior title agent, Ken Heyder, felt it was no longer worth the trouble, so Cohen and Silverman needed a new title company to do their fraudulent title commitments. On or about May 22, 1997, defendant Hollander negotiated a plea for Cohen, wherein Cohen received three years probation (DE:295:21). On May 22, 1997, the same day that the defendant pled Cohen to probation, Hollander did the first closing for Cohen and Silverman in their fraudulent land flip deals (DE:295:39-40). The next closing was a couple of weeks later on June 6, 1997.

12. Defendant Hollander was aware of the fraudulent scheme from the beginning. (DE:295:38-39)(DE:296:20). Silverman testified, "We told [Hollander] completely everything, that these were all flip transactions, we did not have ownership to the property and how the deals were constructed, how the title commitments would have to read so as not to arouse any suspicion" (DE:296:13). Co-defendants Cohen and Silverman both testified that prior to their first transaction with the defendant there was a telephone conference between the mortgage broker, Roni Oz, and the defendant with both Cohen and Silverman present at the defendant's law office (DE:296:14-17). Oz told the defendant that the lenders would not fund if the title commitment reflected the true owner (DE:295:41)(DE:296:16-17). Cohen and Silverman both testified that

the defendant agreed to falsely prepare the title commitments for Cohen and Silverman, but that he would omit the effective date (DE:295:41)(DE:296:16).

13. Thus, the defendant pleads Cohen out to three years probation and then the same day joins Cohen in a fraudulent scheme that knowingly violates the conditions of Cohen's probation. Such egregious conduct by the defendant is outside the "heartland" of conduct considered under the Sentencing Guidelines. For committing this offense while he was on probation Cohen received two additional criminal history points under 4A1.1(d). Cohen also was subject to an additional state sentence for violating his probation. The defendant who negotiated the probationary sentence and then caused Cohen to violate his probation, not once, but 41 times through 41 fraudulently obtained loans, should also receive an adjustment.

14. The defendant also exhibited egregious behavior in using an attorney, David Javits, as an unwitting participant in closing the last fraudulent deal. The defendant also gave advice to Cohen, Silverman and Oz after Corinthian began investigating Oz' company. Defendant Hollander gave Cohen and Silverman talking points as to what to say if they were approached (DE:296:38). Defendant Hollander told Silverman to say that he was just a seller and that he had no knowledge of any irregularities (DE:296:38). In fact, Silverman knew and participated in the mortgage

irregularities and defendant Hollander was telling Silverman to lie. Similarly, he told Cohen to say that he had no knowledge of the false employment information as it came from the borrower (DE:296:39). Oz was to say that Cohen was one of his brokers and he had no idea of any irregularities (DE:296:39). In fact, the defendant told them all how to lie to the bank investigators.[1]

## CONCLUSION

15. For the foregoing reasons the government's Motion for Upward Departure should be granted.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By: _____

JEFFREY N. KAPLAN
Assistant United States Attorney
FLA BAR No. A005500030
500 E. Broward Blvd., Suite 700
Fort Lauderdale, Florida 33394
Tel: (954) 356-7255x3515
Fax: (954) 356-7336

---

[1] As set forth in paragraph 74 of the PSI the defendant had two previous cases before the Florida Bar. The defendant received a public reprimand and six months probation in one case and an admonishment in another case.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered by United States mail, this 23rd day of June, 2004, to: Joel Hirschhorn, Esq., Douglas Center, Penthouse One, 2600 Douglas Road, Coral Gables, Florida 33134, and Georgann Stanley, Supervising United States Probation Officer, 299 East Broward Blvd., Suite 409, Fort Lauderdale, Fl. 33301-1865.

_____
JEFFREY N. KAPLAN
Assistant United States Attorney